## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| BARBARA FORMAN, Individually and On Behalf of All Others Similarly Situated, | Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| MERIDIAN BIOSCIENCE, INC., JOHN A. KRAEUTLER, and MELISSA A. LUEKE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

### COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Barbara Forman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Meridian Bioscience, Inc. ("Meridian" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired Meridian securities from March 25, 2016 through July 13, 2017, both dates inclusive

("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Meridian is a life science company doing business in (i) the development, manufacture, sale and distribution of diagnostic test kits, primarily for certain gastrointestinal, viral, respiratory, and parasitic infectious diseases, and elevated blood lead levels; and (ii) the manufacture and distribution of bulk antigens, antibodies, PCR/qPCR reagents, nucleotides, competent cells, and bioresearch reagents used by researchers and other diagnostic manufacturers.

3.      On March 24, 2016, after the market close, Meridian announced the acquisition of Magellan Biosciences, Inc. and its wholly-owned subsidiary Magellan Diagnostics, Inc. (together "Magellan"). Magellan provides point-of-care lead testing systems for the testing of blood to diagnose lead poisoning in children and adults.

4.      The Company made misrepresentations about Magellan's test systems. As the truth was revealed, the price per share of Meridian's common stock fell $1.30, or over 8% to close at $13.45 on May 17, 2017.

5.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff, and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## PARTIES

9. Plaintiff purchased Meridian Securities within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

10. Defendant Meridian is incorporated under the law of Ohio. The Company's principal offices are located at 3471 River Hills Drive Cincinnati, Ohio 45244. Meridian's stock trades on the NASDAQ under the ticker symbol "VIVO."

11. Defendant John A. Kraeutler ("Kraeutler") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

12. Defendant Melissa A. Lueke ("Lueke") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

13. Defendants in paragraphs 11-12 are collectively referred to herein as the "Individual Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

3

(b)  was directly involved in the day-to-day operations of the Company at the highest levels;

(c)  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)  was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)  approved or ratified these statements in violation of the federal securities laws.

15.  Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Meridian's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

16.  As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with

4

respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Meridian's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Meridian Securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Meridian's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other

shareholders to purchase Meridian securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Background

19.     Meridian is a life science company doing business in (i) the development, manufacture, sale and distribution of diagnostic test kits, primarily for certain gastrointestinal, viral, respiratory, and parasitic infectious diseases, and elevated blood lead levels; and (ii) the manufacture and distribution of bulk antigens, antibodies, PCR/qPCR reagents, nucleotides, competent cells, and bioresearch reagents used by researchers and other diagnostic manufacturers.

### B.     Material Misstatements and Omissions during the Class Period

20.     The Class Period begins March 25, 2016. On March 24, 2016, after the market close, Meridian issued a press release also attached as Exhibit 99.1 to the Form 8-K filed with the SEC announcing the acquisition of Magellan ("March 2016 Press Release"). The Company made material misrepresentations in the press release, including in pertinent part:

**MERIDIAN BIOSCIENCE ACQUIRES MAGELLAN DIAGNOSTICS, INC.**

CINCINNATI, March 24, 2016 (GLOBE NEWSWIRE)—Meridian Bioscience, Inc., Cincinnati, Ohio (NASDAQ: VIVO) announced today that it has completed the acquisition of Magellan Biosciences, Inc. and its wholly owned subsidiary Magellan Diagnostics, Inc. Headquartered in Billerica, Massachusetts (near Boston), Magellan pioneered the engineering, development and manufacturing of FDA-cleared products for the testing of blood to diagnose lead poisoning in children and adults.

***Today, Magellan is the leading provider of point-of-care lead testing systems with placements in more than 6,500 physician offices and clinics nationwide. Its position in pediatric offices is particularly strong. LeadCare® II, the only CLIA-waived lead testing system, enables physician practices to enhance the quality of care, improve patient compliance and convenience, and reduce costs.*** Magellan's

6

LeadCare Ultra® and Plus® systems are designed for use in hospitals and reference labs.

**_Magellan has a robust product development pipeline and plans to introduce a third generation platform that will include a menu of additional high value CLIA-waived pediatric tests including, but not limited to, lead testing._** Magellan's talented team of executives and employees led by Amy Winslow, President and Chief Executive Officer of Magellan, will continue to manage the business, which will remain in its current location and facility.

\*          \*          \*

John A. Kraeutler, Chairman and Chief Executive Officer of Meridian, commented, "**_A key underpinning of our diagnostic growth strategies has been to address 'test and treat' opportunities by applying highly accurate and simple-to-use tests for rapid diagnoses, thereby enabling appropriate treatment._** Because elevated lead levels can cause serious developmental impairment, especially in young children, the need for broad testing and fast remediation of the contaminated environment is acute. Magellan has maintained a clear focus on developing and marketing test systems that are well recognized for their accuracy and ease-of-use. Further, the Magellan test systems are now in use by more than 10,000 pediatricians, primarily in the U.S. We believe that there is excellent growth potential in Magellan Diagnostics on its own, both with the existing products and the pending new product pipeline.

Emphasis added.

21.     On October 20, 2016, issued a press release, also attached as Exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended September 30, 2016 ("FY 2016 Press Release"). The press release stated in relevant part:

**Meridian Bioscience, Inc. Comments on Preliminary Fiscal 2016 Operating Results and Provides Fiscal 2017 Revenue and Earnings Guidance**

CINCINNATI, October 18, 2016 (GLOBE NEWSWIRE) – Meridian Bioscience, Inc. (NASDAQ: VIVO) today announced that based on preliminary results, it expects revenues for fiscal year 2016, ended on September 30, 2016, to be approximately $196 million, an increase of 1% compared to the prior year. Diluted earnings per share are expected

to be $0.75 to $0.76, including costs related to acquisition activity and costs associated with the reorganization of Diagnostics sales and marketing leadership (in the aggregate, $1.7 million after tax or $0.04 diluted earnings per share). This compares to diluted earnings per share of $0.85 in fiscal 2015.

These preliminary results reflect fourth quarter revenues of approximately $47 million. Our fourth quarter revenues reflect a combination of ongoing competitive pressures during the quarter within the *C. difficile* and food product families, distributor order patterns, and the timing of respiratory season stocking orders within the core diagnostics business. Despite these negative factors, we experienced continued growth in our *H. pylori* product family and benefited from the addition of revenues from our March 2016 acquisition of Magellan Diagnostics. Life Science revenues were flat for the quarter due to a large immunoassay component order that was shipped in the third quarter versus the fourth quarter at the customer's request. The resulting revenue shortfalls produce the shortfall in earnings compared to guidance. Our recent acquisition of Magellan has gone well. Magellan performed above revenue expectations and is expected to be a penny dilutive to earnings per share for the six months since the acquisition, also better than expected.

*       *       *

***Magellan Diagnostics, acquired in March of 2016 and included in our Diagnostics Segment, has exceeded expectations thus far. For fiscal 2017, we are expecting low double-digit revenue growth on a normalized annual basis from continued success in placing the LeadCare II platform in the domestic market. Expansion into international markets, including China following the recent CDFA approval of LeadCare II, is expected to contribute to revenues and may generate revenue upside***. Capitalizing on the increased awareness of lead poisoning, we also expect to begin selling into OB/GYN offices.

Emphasis added.

22.     On November 29, 2016, Meridian filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fourth fiscal quarter and year ended September 30, 2016 ("FY 2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. Throughout the FY 2016 10-K the company reaffirmed the previous statements, and added in relevant part:

### *Overview of Products and Markets*

Our primary source of revenues continues to be diagnostic products, with our Diagnostics segment providing 74% of consolidated net revenues for fiscal 2016. Third-party revenues for this segment were $145,000, $146,000 and $142,000 for fiscal 2016, 2015 and 2014, respectively. As of September 30, 2016, our Diagnostics segment had approximately 440 employees in seven countries.

***Our diagnostic products provide accuracy, simplicity and speed; enable early diagnosis and treatment of common, acute medical conditions; and provide for better patient outcomes at reduced costs.*** We target diagnostics for disease states that (i) are conditions where rapid diagnosis impacts patient outcomes; (ii) have opportunistic demographic and disease profiles; (iii) are underserved by current diagnostic products; and (iv) have difficult sample handling requirements (stool, blood, urine and other body fluids). This approach has allowed us to establish significant market share in our target disease states.

Our diagnostic products span a broad menu of testing platforms and technologies, and also include transport media that store and preserve specimen samples from patient collection to laboratory testing. Our testing platforms include:

• Isothermal DNA Amplification (illumigene brand) – high sensitivity, molecular platform that is suitable for virtually any size laboratory, whether centralized or decentralized; provides flexibility to process from 1 to 10 tests per run in generally under one hour; and requires no batching of samples.

• Rapid Immunoassay (TRU, ImmunoCard and ImmunoCard STAT! brands) – single-use immunoassays that can be used in point-of-care settings; have fast turnaround times (generally under 20 minutes); and can reduce expensive send-outs for hospitals and outpatient clinics.

• Enzyme-linked Immunoassay (PREMIER brand) – batch immunoassay platform that can process up to 96 tests per run; is highly accurate and economical; and is adaptable to automation.

• Anodic Stripping Voltammetry (LeadCare brand) – electrical chemical sensor platform for quantitative determination of lead levels in blood.

Emphasis added.

9

23.     The statements in paragraphs ¶20-¶22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendant's lead tests provide inaccurate results; and (ii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**C.     The Truth Slowly Emerges**

24.     On May 17, 2017, the U.S. Food and Drug Administration ("FDA") issued a press release warning Americans about the inaccuracy of the Company's lead tests ("May 2017 Press Release"):

> *The U.S. Food and Drug Administration and Centers for Disease Control and Prevention are warning Americans that certain lead tests manufactured by Magellan Diagnostics may provide inaccurate results for some children and adults in the United States.* The CDC recommends that parents of children younger than six years (72 months) of age, and currently pregnant women and nursing mothers who have been tested for lead exposure consult a health care professional about whether they should be retested.
>
> "*The FDA is deeply concerned by this situation and is warning laboratories and health care professionals that they should not use any Magellan Diagnostics' lead tests with blood drawn from a vein,*" said Jeffrey Shuren, M.D., director of the FDA's Center for Devices and Radiological Health. "The agency is aggressively investigating this complicated issue to determine the cause of the inaccurate results and working with the CDC and other public health partners to address the problem as quickly as possible."
>
> *The FDA's warning is based on currently available data that indicate Magellan lead tests, when performed on blood drawn from a vein, may provide results that are lower than the actual level of lead in the blood. Currently, the FDA believes the issue may date back to 2014. The warning includes all four of Magellan Diagnostics' lead testing systems: LeadCare; LeadCare II; LeadCare Plus; and LeadCare Ultra.*

10

At this time, all LeadCare systems can be used with blood from a finger or heel stick, including the LeadCare II system - a system found in many doctors' offices and clinics. In addition, some laboratories offer other methods of lead testing, which are not believed to be affected at this time.

The CDC is recommending that health care professionals retest children younger than six years (72 months) of age at the time of this alert (May 17, 2017) if their test was conducted using blood drawn from a vein using any Magellan Diagnostics' LeadCare System tests and received a result of less than 10 micrograms per deciliter (µg/dL). The CDC also recommends that women, who are currently pregnant or nursing and were tested in this manner while pregnant or nursing, get retested. Other adults who are concerned about their risk or the risk to an older child should speak to their health care professional about whether they should be retested.

"We understand that parents of children and others affected by this problem will be concerned about what this means for their health," said Patrick Breysse, Ph.D., director of the CDC's National Center for Environmental Health. "While most children likely received an accurate test result, it is important to identify those whose exposure was missed, or underestimated, so that they can receive proper care. For this reason, because every child's health is important, the CDC recommends that those at greatest risk be retested."

Lead exposure can affect nearly every system in the body, produces no obvious symptoms, and frequently goes unrecognized, potentially leading to serious health issues. Lead poisoning is particularly dangerous to infants and young children. While recommendations for lead screening differ from state to state, all states require children to be screened for lead exposure. Some adults are also at risk for lead exposure, including those who work around products or materials that contain lead.

The FDA, an agency within the U.S. Department of Health and Human Services, promotes and protects the public health by, among other things, assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

CDC works 24/7 protecting America's health, safety and security. Whether diseases start at home or abroad, are curable or preventable,

11

chronic or acute, stem from human error or deliberate attack, CDC is committed to respond to America's most pressing health challenges.

Emphasis added.

25.     On this news, the price per share of Meridian's common stock fell $1.30, or over 8% to close at $13.45 on May 17, 2017.

26.     On July 13, 2017, the FDA issued a statement ("July 2017 FDA Statement") entitled "Alberto Gutierrez, Ph.D., Director, Office of In Vitro Diagnostics and Radiological Health, FDA's Center for Devices and Radiological Health on the status of FDA's investigation into inaccurate results from certain lead tests," stating:

> **On May 17, the U.S. Food and Drug Administration warned Americans that Magellan Diagnostics' LeadCare test systems performed on blood drawn from the vein (venous) may provide inaccurate results.**
>
> At that time, our first priority was to warn laboratories, health care professionals and people who may have been impacted by this issue. **We also launched an aggressive investigation to determine the cause of the inaccurate results and promised to continue to communicate as we learned more about the issue.**
>
> **As part of our investigation, we inspected Magellan Diagnostics' facility in North Billerica, Massachusetts. Today, we are releasing the report issued at the conclusion of the inspection, which includes several inspectional observations that may be violations of federal law. We are carefully reviewing the evidence collected during the inspection to determine if there have been violations of federal law and whether further action is warranted.**
>
> **The FDA takes these observations and the risks these tests may have posed to patients very seriously and continues to encourage people to follow the FDA's and Centers for Disease Control and Prevention's recommendations from May 17.**
>
> As we continue our investigation into the cause of the inaccurate results, the FDA will continue to provide updates on our findings and any changes to our recommendations.

> The FDA, an agency within the U.S. Department of Health and Human Services, protects the public health by assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

Emphasis added.

27.     The same day, the FDA issued to a Form-483 to the Company ("July 2017 FDA Form 483"). Such forms are issued at the conclusion of an inspection when an FDA investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff, and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

29.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Meridian, their control over, and/or receipt and/or modification of Meridian's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Meridian, participated in the fraudulent scheme alleged herein.

13

## LOSS CAUSATION AND ECONOMIC LOSS

30.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's Securities. As detailed above, when the truth about Meridian's misconduct and its lack of operational and financial controls was revealed, the value of the Company's Securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Meridian's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the Securities price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

31.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Meridian's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Meridian's Securities to be artificially inflated.

14

Plaintiff and other Class members purchased Meridian's Securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

32.     At all relevant times, the market for Meridian Securities was an efficient market for the following reasons, among others:

(a) Meridian Securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Meridian Securities were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, Meridian filed with the SEC periodic public reports during the Class Period;

(d) Meridian regularly communicated with public investors via established market communication mechanisms;

(e) Meridian was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Meridian was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

33.     As a result of the foregoing, the market for Meridian Securities promptly digested current information regarding Meridian from all publicly available sources and reflected such information in Meridian's stock price. Under these circumstances, all purchasers of Meridian Securities during the Class Period suffered similar injury through their purchase of Meridian's

15

Securities at artificially inflated prices, and a presumption of reliance applies.

34.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Meridian.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

35.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

36.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

37.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Meridian who knew that

16

the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## **CLASS ACTION ALLEGATIONS**

38.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Meridian Securities on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

39.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Meridian securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Meridian or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.

Joinder would be highly impracticable.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

41.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

>       (a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

>       (b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

>       (c)     whether the price of Meridian securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

>       (d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as

a class action.

### COUNT I
#### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Meridian Securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

46.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's Securities in an effort to maintain artificially high market prices for Meridian securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Meridian as specified herein.

19

48.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Meridian's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Meridian and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Meridian Securities during the Class Period.

49.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

50.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Meridian's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Meridian's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Meridian's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Meridian's Securities during the Class Period at artificially high prices and were or will be damaged thereby.

52.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the

21

other members of the Class and the marketplace known the truth regarding Meridian's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Meridian securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

53.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

54.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Securities during the Class Period.

55.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of Securities giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    The Individual Defendants acted as controlling persons of Meridian within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided

with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

58.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.     As set forth above, Meridian, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

60.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Securities during the Class Period.

61.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of Securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other

members of the Class against all Defendants, jointly and severally, for all

damages sustained as a result of the defendants' wrongdoing, in an

amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees;

(d)      Granting extraordinary equitable and/or injunctive relief as permitted by

law; and

(e)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated:  November 15, 2017

*Local Counsel*
Perantinides & Nolan Co., L.P.A.

*/s/ Chris T. Nolan*
CHRIS T. NOLAN (0006617)
300 Courtyard Square
80 S. Summit Street
Akron, Ohio  44308-1736
(330) 253-5454
(330) 253-6524 – fax
Email: cnolan@perantinides.com

*Liaison Counsel*

/s/ Eduard Korsinsky
**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com

*Attorneys for Plaintiff*

24