**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| BARBARA FORMAN, Individually and On Behalf of All Other Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MERIDIAN BIOSCIENCE, INC., JOHN A. KRAEUTLER, and MELISSA A. LUEKE,<br><br>Defendants. | Civil Action No. 1:17-cv-00774-SJD<br><br>Judge Susan J. Dlott<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TIAL** |

**CUMMINS LAW LLC**
James R. Cummins (0000861)
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202
Tel.: (513) 721-9000
Fax: (513) 721-9001
Email: jcummins@cumminslaw.us

*Liaison Counsel for Lead Plaintiff and the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Sebastiano Tornatore (to be admitted *pro hac vice*)
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel.: (203) 992-4523
Facsimile: (212) 363-7171

*Lead Counsel for Lead Plaintiff and the Class*

Table of Contents


I. SUMMARY OF THE ACTION ........ 2

II. JURISDICTION AND VENUE ........ 6

III. THE PARTIES ........ 7

A. Plaintiff ........ 7

B. Defendants ........ 7

C. Relevant Non-Parties ........ 9

IV. FACTUAL ALLEGATIONS ........ 10

A. Meridian is Highly Reliant on its Diagnostic Business ........ 10

B. Meridian Desperately Seeks an Acquisition After Running Out of Options Due to the Failure of its illumigene Platform, the Expiration of its Key Patent and Fierce Industry Competition ........ 11

C. Meridian Leverages Itself to Acquire Magellan to Fill a Much-Needed Void ........ 18

1. Magellan Is a Major Player in the Lead Testing Area ........ 21

2. Proactive Point of Care Testing is Critical for Early Detection and Prevention of Life-Threatening Conditions Associated with Lead Poisoning ........ 23

3. At all Relevant Times, the LeadCare Products Were Subject to Strict FDA Regulation ........ 26

D. Defendants Conceal from the FDA and the Investing Public That the LeadCare Systems Were Producing Faulty Test Results in Millions of Patients for More Than Three Years ........ 28

E. Defendants Were Aware of the Class Period Complaints and Other Regulatory Violations Through Monthly and Quarterly Business Reviews and Other Meetings They Attended ........ 36

F. The FDA Uncovers Years' of Customer Complaints and Regulatory Violations During its Site Inspection and Defendant Kraeutler Announces his Retirement ........ 38

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ........ 39

A. Materially False and Misleading Statements About Compliance of the LeadCare Products with FDA and Government Regulations ........ 40

B. Materially False and Misleading Statements Regarding the Efficacy of LeadCare Products ........ 43

C. Materially False and Misleading Statements About Internal Controls ........ 46

VI. THE TRUTH IS REVEALED OVER THE COURSE OF SEVERAL PARTIAL DISCLOSURES ........ 51

A. The Truth is Partially Revealed when the Company announces a Decrease in its Guidance and Dividend ........ 51

B. The FDA's May 17, 2017 Announcement Reveals for the First Time that Certain of Meridian's LeadCare Products Were Producing Inaccurate Results ................................ 54

C. The FDA'S Site Inspection Report Confirms Prior LeadCare Product Issues and A Company That Knew About the Lead Underestimation Issues, Yet Actively Concealed Complaints and Labeling Changes From the FDA ........................................................ 58

D. The Truth is Fully Revealed When the FDA Issues its Warning Letter on October 23, 2017, Detailing the Full Extent of Defendants' Violations of FDA Regulations, the Problems with the LeadCare Products and the Extent of Defendants' Deceit on the FDA ...................... 62

VII. DEFENDANTS' POST-CLASS PERIOD ADMISSIONS AND OTHER MATERIAL POST-CLASS PERIOD EVENTS ..................................................................... 75

A. Defendants Admit Prior Class Period Statements Regarding Compliance With FDA Regulations Were False When Made ................................................................... 75

B. Defendants Admit Meridian's Internal Controls Were Inadequate Throughout the Class Period ........................................................................................................ 77

C. The FDA Issues a Warning Letter to Becton Dickinson for Its Role in the LeadCare Problems ................................................................................................... 81

D. On the Heels of the FDA Recall and Warning Letter, Meridian Reports a 20% Decline in Operating Income ......................................................................................... 82

E. The FDA Credits Becton Dickinson's Studies that Showed There was a Significant Chance of False results with LeadCare tests ..................................................................... 83

VIII. ADDITIONAL SCIENTER ALLEGATIONS .......................................................... 83

A. The Individual Defendants' Knowledge and/or Reckless Disregard for the Numerous LeadCare Product Complaints and Magellan's Failure to Comply with FDA Regulations ......................................................................................... 84

1. Defendants' Admitted Due Diligence of Magellan Would Have Revealed Magellan's LeadCare Product Issues and FDA Non-Compliance .................................... 84

2. Monthly and Quarterly Meetings and Reports Informed Defendants of Magellan's Class Period LeadCare Product Issues ....................................................................... 85

3. Internal Magellan Documents Differed Drastically from Defendants' Public Statements ............................................................................................................ 85

4. Meridian's January 2017 Guidance Adjustment Evidences the Individual Defendants' Knowledge of LeadCare Issues ...................................................................... 87

5. The Individual Defendants' Misleading Representations Occurred Shortly Before the Release of Starkly Inconsistent Information .................................................... 91

6. The FDA's and CDC's Investigation, Findings and Injunction are Probative of Defendants' Scienter ......................................................................................................... 91

7. The Suspicious Timing and Circumstances of Kraeutler's Retirement Announcement Supports an Inference of Scienter ....................................................................... 92

B. Meridian's Corporate Scienter by Virtue of the Knowledge and/or Recklessness of its Executive Vice President, Amy Winslow ........................................................... 93

C. Defendants Were Motivated to Commit the Alleged Fraud ........................................ 100

1. The Magellan Acquisition Was Critical to Salvage Meridian's Declining Non-Molecular Diagnostics Business and the Company's Future Long-Term Viability ........................ 100

2. Defendants' Motive to Collect Their Significant Stock Option Grant from the Magellan Acquisition ........................................................................................................ 101

IX. LOSS CAUSATION ........................................................................................ 101

X. PRESUMPTION OF RELIANCE ...................................................................... 104

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................................................ 105

XII. CLASS ACTION ALLEGATIONS ................................................................... 106

XIII. PRAYER FOR RELIEF ................................................................................. 111

XIV. JURY DEMAND ........................................................................................ 111

Court-appointed Lead Plaintiff Barbara Forman ("Lead Plaintiff"), by her undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of herself and all other persons or entities who purchased or otherwise acquired securities of Meridian Bioscience, Inc. ("Meridian" or the "Company") between March 24, 2016 and October 23, 2017 (the "Class Period").

Lead Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based upon, among other things, the ongoing independent investigation of Court-appointed Lead Counsel, Levi & Korsinsky LLP ("Counsel"). This investigation includes, among other things, a review and analysis of: (i) public filings by Meridian with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movements and pricing data; (v) transcripts of conferences with Meridian senior management; (vi) consultation with relevant experts and consultants; (vii) interviews with former Meridian employees; and (viii) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting Lead Plaintiff's allegations are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiff believes that further evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. At the core of this action lays Defendants'[1] pervasive scheme to conceal the fact that ***every lead testing product Meridian offered*** underestimated blood lead levels, all at the expense of our country's most vulnerable populations: children, pregnant women, and nursing mothers.

2. The documented issues with the LeadCare family of products (LeadCare, LeadCare II, LeadCare Ultra, and LeadCare Plus) predate Meridian's March 24, 2016 acquisition of Magellan Biosciences, Inc. and its wholly-owned subsidiary Magellan Diagnostics, Inc. (collectively, "Magellan") (the "Merger"). In fact, as would only come to light following the publication by the United States Food and Drug Administration (the "FDA") of its Form 483 site inspection report and findings, Magellan had been aware of the lead underestimation issues for years prior, but sought to mitigate any damage by unilaterally instructing its customers to implement certain unvalidated steps to purportedly rectify the problem.

3. Disregarding any ill effect this issue was then having on the potentially millions of individuals who had been given a false negative for lead poisoning through its products, Magellan, then Meridian carried out purported corrective actions without any notification to the FDA in the form of a unilateral implementation of an incubation period, in direct violation of controlling statutes and regulations.

4. For its part, Meridian was all too eager to allow for these at-risk individuals to remain in the dark and assume the regulatory risk of the LeadCare products if it meant securing for itself a financial lifeline that would immediately add a turnkey accretive business to help bolster an otherwise floundering diagnostic segment that was preparing for additional near-term turmoil

[1] As used herein, "Defendants" refers to Meridian, John A. Kraeutler ("Kraeutler"), and Melissa A. Lueke ("Lueke"), collectively.

as a result of the then-forthcoming expiration of the patent over the technology underlying Meridian's historically strong *H. Pylori* franchise and increased competition across the entire diagnostics segment.

5. Upon assuming control over Magellan and bringing it under the Company's umbrella (which included leaving much of Magellan's management team in place, including its chief executive officer and president, Amy S. Winslow), Meridian continued to hide from the FDA and the investing public the dire flaw in the family of products that it had just paid $66 million for in the Merger.

6. Instead, Meridian regularly touted Magellan's "FDA-cleared" "point-of-care testing systems," statements Defendants knew to be false. Magellan and then Meridian actively sought to skirt FDA reporting requirements by failing to submit notifications of corrective actions in a timely manner or at all. Although "point-of-care" indicates the tests immediately generate results, in reality, each LeadCare product required a lengthy incubation period (four or twenty-four hours) before testing blood drawn from the vein – meaning that no LeadCare product was able to function as intended, that being, to provide accurate and rapid diagnoses by a doctor or clinician.

7. The cover-up began to unravel in May 2017 when the FDA began its fifteen day site inspection of the Billerica, Massachusetts facility. On May 17, 2017, after just four days on site, the FDA had seen enough red flags to issue a press release, along with the United States Center for Disease Control ("CDC"), warning of the LeadCare products' inaccurate results and recommending retesting of certain children, pregnant women and nursing mothers. The announcement would send Meridian's stock price tumbling nearly 9%, from a closing price of $14.75 on May 16, 2017 to $13.45 on May 17, 2017.

8. Thereafter, on May 18, 2017, the FDA commenced a Class I recall (reserved for those situations in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death) for all LeadCare Ultra and LeadCare Plus products. This recall was then expanded to include LeadCare and LeadCare II products. It was estimated that the cross-product recall affected approximately 8 million individuals over a span of three-plus years who had been tested for lead poisoning via one of the LeadCare products.

9. Meridian's concealment incensed a public already sensitive to lead problems as a result of several high profile lead contamination breakouts that disproportionately affected children in Flint, Michigan in 2014 and in Sebring, Ohio in 2016. Meridian's failure to act even drew the ire of twelve United States senators, who joined together to pen the June 29, 2017 letter to the commissioner of the FDA and acting director of the CDC. The senators' letter did not mince words and made clear that those senators believed the Company was seeking to hide the full truth from the FDA (and, in turn, the investing public):

> ***It is alarming whenever a diagnostic test is found to be inaccurate, but even more so when children are the predominant population for whom the test is used***. It is imperative that any inaccuracies in these sorts of tests are promptly identified and reported by the manufacturer to the FDA for further action. In this case, the issue with Magellan's tests dates back to 2014, however, the company did not alert FDA of any issues with the tests until the following year. Magellan's reporting to the FDA in 2015 and 2016 significantly downplayed the seriousness of the issue. [2]

10. Unsurprisingly, the public rebuke and negative publicity would reverberate through Meridian's financial statements, with the Company in July 2017 assessing an impairment charge of more than $6.6 million to the goodwill asset recorded in connection with the Merger.

[2] All emphasis is added unless otherwise indicated.

11. The full truth was finally revealed when, on October 23, 2017, the FDA issued its formal warning letter to Magellan that set forth the observations found by the FDA in its site inspection and cast aside Magellan's proposed fixes to the issues as inadequate. Therein, the FDA made clear that any failure to promptly correct the violations identified by the regulator could result in seizure, injunction, and civil monetary penalties, as well as the halting of the approval of premarket approval applications for any Class III medical device to which the quality system regulation violations identified in the warning letter (which stretched across Magellan's entire facility) were related. The market effects of this revelation were immediately seen, with the Company's stock price dropping from a closing price of $15.80 per share on October 20, 2017 to $15.20 per share on October 23, 2017, then to $14.50 per share on October 24, 2017 – a one day drop of approximately 4% and a two-day drop of more than 8%.

12. As alleged herein, each of the Defendants acted with the requisite scienter during the Class Period, either knowingly or recklessly disregarding the truth about Magellan's flagship LeadCare technology in an effort to artificially prop up Meridian's stock price. Defendants' scienter is multi-faceted and, when viewed holistically, shows a Company that was struggling to adapt to fierce competition in its historically strong product segments, while simultaneously unable to recapture any lost market share with its newest product, all the while remaining shackled to a stringent dividend policy that all but ensured the stunting of organic growth. Instead, the way forward for the Defendants was simple – a low cost, quick acquisition of non-public Magellan.

13. In the wake of the FDA's announcement and recall, Meridian has struggled to gain its financial footing, announcing a 20% decrease in operating income for the entire Company in three months ended December 31, 2017 to go along with a 20% decline in Magellan revenue over the same quarter prior year. This after reporting a 7% decline in Magellan revenues during the

fourth quarter of 2017 en route to reporting just 2% revenue growth for the year, a shocking figure given that Meridian reported a 32% increase in quarter over quarter Magellan revenue in the first quarter of 2017, flat revenues for the second quarter, and a 9% decline in the third quarter.

14. As of the date of this Complaint, the FDA and CDC continue to analyze the LeadCare systems and the FDA's recall remains in place with respect to the testing of blood drawn from the vein using any LeadCare product.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Meridian trades in an efficient market on the NASDAQ Stock Market ("Nasdaq").

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District. Additionally, Defendant Meridian conducts business and maintains executive offices in this District at 3471 River Hills Drive, Cincinnati, Ohio 45244.

## III. THE PARTIES

### A. PLAINTIFF

18. Court-appointed Lead Plaintiff Barbara Forman purchased Meridian securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in her PSLRA Certification, filed with the Court on January 16, 2018 (ECF No. 10-2), incorporated herein by reference.

### B. DEFENDANTS

19. Defendant Meridian is a life science company engaged in developing, manufacturing, selling, and distributing clinical diagnostic test kits for certain gastrointestinal, viral, respiratory, and parasitic infectious diseases. According to the Company's website, Meridian's mission is to "efficiently apply [its] human, scientific, and financial resources to provide innovative high value products and technologies that improve the diagnosis and treatment of infectious diseases and metabolic disorders."

20. Defendant John A. Kraeutler was the Company's Chief Executive Officer from 2008, and Chairman of Meridian's Board of Directors from 2014, until his retirement from the Company in October 2017. Kraeutler has since assumed the role of Executive Chairman of Meridian.

21. Defendant Melissa A. Lueke has served as the Company's Vice President, Chief Financial Officer, and Secretary since 2001, and was appointed Executive Vice President in 2009.

22. Defendants Kraeutler and Lueke are collectively referred to as the "Individual Defendants" and, together with Meridian, as the "Defendants."

23. Each of the Individual Defendants, by virtue of his or her high-level position with Meridian, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and

proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his or her respective tenure with the Company, as alleged herein. As alleged below in Section V, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants. Each of these individuals, during his or her tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

24. As executive officers of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the Nasdaq, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

25. Each of the Individual Defendants, because of his or her positions of control and authority as an executive officer of Meridian, was able to and did control the content of the SEC filings, press releases, and other public statements that Meridian issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

26. Each of the Individual Defendants, because of his or her positions of control and authority as an executive officer of Meridian, had access to the adverse undisclosed information about Meridian's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Meridian officers and employees, attendance at Meridian management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about Meridian materially false or misleading.

27. Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Meridian securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Meridian's products, business, operations, and management, and the intrinsic value of Meridian common stock; and (ii) caused Lead Plaintiff and members of the Class to acquire Meridian common stock at artificially inflated prices.

### C. RELEVANT NON-PARTIES

28. Non-Party Magellan is comprised of Magellan Biosciences, Inc. and its wholly-owned subsidiary Magellan Diagnostics, Inc. Headquartered in Billerica, Massachusetts, Magellan's business is focused on the manufacturing of products of testing lead levels in blood. In March 2016, Meridian acquired Magellan for $66 million.

29. Non-Party Amy M. Winslow ("Winslow") is a current Meridian Executive Vice President and President and CEO of Magellan, having assumed that position on March 24, 2016. Prior to Meridian's acquisition of Magellan, Winslow served as the President and Chief Executive Officer of Magellan since 2011.

30. Non-Party Becton, Dickinson and Company ("Becton Dickinson" or "BD") is an American medical technology company headquartered in New Jersey. Throughout the Class Period, BD manufactured the vacutainer blood collection tubes used in Magellan's LeadCare product line.

## IV. FACTUAL ALLEGATIONS

### A. MERIDIAN IS HIGHLY RELIANT ON ITS DIAGNOSTIC BUSINESS

31. Meridian describes itself as a fully-integrated life science company with principal businesses in (i) the development, manufacture, sale and distribution of diagnostic test kits, primarily for certain gastrointestinal, viral, respiratory and parasitic infectious diseases, and elevated blood lead levels; (ii) the manufacture and distribution of bulk antigens, antibodies, PCR/qPCR reagents, nucleotides, competent cells and bioresearch reagents used by researchers and other diagnostic manufacturers; and (iii) the contract development and manufacture of proteins and other biologicals under cGMP conditions for use by biopharmaceutical and biotechnology companies engaged in research for new drugs and vaccines. These lines of business are split into two reporting segments: Diagnostics and Life Science.

32. Prior to the Merger, the Diagnostics segment consisted of manufacturing operations in Cincinnati, Ohio, and the sale and distribution of diagnostic test kits in the countries comprising North, Central and South America (the "Americas"); Europe, Middle East and Africa ("EMEA"); and other countries outside of the Americas and EMEA (rest of the world, or "ROW").

33. The Life Science segment consisted of manufacturing operations in Memphis, Tennessee; Boca Raton, Florida; London, England; Luckenwalde, Germany; and Sydney, Australia, and the sale and distribution of bulk antigens, antibodies, PCR/qPCR reagents, nucleotides, competent cells and bioresearch reagents domestically and abroad, including sales and business development offices in Singapore and Beijing. The Life Science segment also

included the contract development and manufacture of cGMP clinical grade proteins and other biologicals for use by biopharmaceutical and biotechnology companies engaged in research for new drugs and vaccines.

34. At that time, the Company's primary source of revenue came from its diagnostics products, with its Diagnostics segment providing 75% of consolidated net revenues for fiscal 2015.

### B. Meridian Desperately Seeks an Acquisition After Running Out of Options Due to the Failure of its illumigene Platform, the Expiration of its Key Patent and Fierce Industry Competition

35. Prior to the Company's acquisition of Magellan, the Diagnostics business function was principally focused on non-molecular diagnostics products to diagnose instances of: *C. Difficile*; Foodborne issues (including *E. coli*); *H. pylori*; Respiratory illnesses; and Women's Health & Sexually Transmitted Diseases.

36. This lack of product portfolio diversity resulted in a Company that was disproportionately reliant on a handful of products, with revenues within these focus product families accounting for 79%, 77% and 77% of Meridian's Diagnostics segment's third-party revenues during fiscal 2015, 2014 and 2013, respectively.

37. The risks related to Meridian's limited focus began to materialize as global market trends saw new entrants into the non-molecular diagnostics markets and increased pressure to contain health care costs. These pressures left the Company scrambling to supplement its traditional, non-molecular diagnostics business in order to remain competitive.

38. Initially, those efforts took the form of a molecular testing platform, illumigene, which Meridian rolled out in 2011. Molecular diagnostic testing involves an analysis of the patient's genetic code to diagnose and monitor disease, allowing for greater insight into the strain of disease and better informing a course of treatment. Illumigene allowed for the testing of certain

kinds of bacteria in patient samples without the use of costly instruments or techniques. It was Meridian's first venture into molecular diagnostics and was meant to be a cutting edge alternative to antibody based testing as the Company was hoping it could propel a recapture of diagnostic market share previously lost to larger competitors. Illumigene's success was critical to Meridian's future viability as it provided a foray into the emerging world of molecular testing for clinical laboratories – a space that had not yet become saturated with competitors like the traditional non-molecular diagnostic arena.

39. But Meridian's unique status as a molecular testing provider was short-lived. As Defendant Kraeutler stated at the September 3, 2014 Robert W. Bair & Co. Inc. Health Care Conference:

> Four years ago in molecular in the clinical laboratory, it was really only Meridian and Cepheid competing in that market. Today, you've got at least 10 other platforms that want to get into this space. . . ***[I]n the last two to three years, the number of new competitors that are coming in, some with very desperate measures to try to get a foothold in the market, has really created chaos in the market***.

40. The uncertainty of illumigene and Meridian's long-term viability in the face of fierce competition caused analysts to maintain low performance expectations for the Company. For instance, in January 2015, Cowen & Co. analysts published a research note citing "competitive and market pressures" as a reason for its verdict: "Until we gain conviction that the outlook can truly improve (not just be better than very low expectations), via organic or inorganic means, we remain at Market Perform."

41. Illumigene, however, did not take off the way Meridian had hoped because the platform was stymied by its low volume processing capability. As noted by Kurt Kemper, an analyst for Hilliard Lyons in an August 27, 2015 research note, illumigene is "not concentrated in these end markets due to certain regulatory requirements that must be met by the clinical and

physician practices that desire in-house laboratories. Also, due to high volume requirements, Meridian does not have a large position in the commercial labs, typically only providing to some smaller satellite locations." Thus, while the molecular diagnostic testing market was growing as a whole, the Company's illumigene product only appealed to those small-scale labs and clinicians who valued a small footprint over throughput.

42. Analysts from Canaccord shared Hilliard Lyons' concerns. In a January 2016 research note, Canaccord analysts noted that "[w]hile VIVO has a good molecular offering in illumigene in the lower-throughout hospital market, VIVO continues to run into Cepheid and Becton Dickinson." Importantly, even at this point, Canaccord was forecasting the need for an acquisition in order to make the Company competitive in the long-term: "We'd get constructive on this stock if the company can accelerate top-line growth in the high single or low double digits, or make a compelling acquisition to complement its organic growth."

43. CW1, a former Director of Commercial Operations Integration for the diagnostics business from 2011 until September 2016 responsible for managing and tracking sales and handling customer service issues, including product installation and complaints, confirmed illumigene's shortcomings. CW1, who reported to Chuck Caso, Global VP of Sales and Marketing, Diagnostics, who himself reported directly to defendant Kraeutler, stated that most customers were going towards a big box unit that could handle testing more than one type of disease at a time, while the illumigene product was too small, about the size of an 8 x 11 inch piece of paper, and could only handle five blood samples at a time. Thus, CW1 stated that Meridian was never able to hit its placement targets for illumigene and lost significant market share to competitors' larger, multiplexing machines.

44. Hamstrung by illumigene's limitations, the desperately needed seismic shift in Meridian's diagnostics business from non-molecular to molecular never materialized and Meridian remained dependent on a Diagnostics business segment that itself was highly dependent on the Company's non-molecular product offerings:

| | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|
| Molecular | $ 9,042.00 | $ 23,248.00 | $ 33,597.00 | $ 36,981.00 | $ 40,880.00 |
| *Percent of Total Diagnostics Revenue* | *7.5%* | *17.9%* | *23.2%* | *26.1%* | *28.0%* |
| Non-Molecular | $ 111,391.00 | $ 106,932.00 | $ 111,032.00 | $ 104,519.00 | $ 105,234.00 |
| *Percent of Total Diagnostics Revenue* | *92.5%* | *82.1%* | *76.8%* | *73.9%* | *72.0%* |
| | | | | | |
| *Total Diagnostics* | $ 120,433.00 | $ 130,180.00 | $ 144,629.00 | $ 141,500.00 | $ 146,114.00 |
| *Percent of Total Company Revenue* | *75.82%* | *75.37%* | *76.65%* | *74.93%* | *75.00%* |
| | | | | | |
| Total Company Revenue | **$ 158,836.00** | **$ 172,712.00** | **$ 188,686.00** | **$ 188,832.00** | **$ 194,830.00** |

45. Industry analysts noted the Company's stagnation. For example, in January 2016, after the Company reported a top-line miss on its earnings for the first quarter of 2016, PiperJaffray issued an investment note voicing its "competitive concerns on VIVO's current suite of tests/platforms" – specifically referencing its belief that the Company's historically strong franchises (such as *C. Diff.*) would continue to lose market share to existing and forthcoming molecular diagnostics products and that a possible acquisition could help propel the Company forward. Based on their forecast for the Company, the analysts maintained an "underweight" rating – indicating that it anticipated Meridian to underperform relative to the median of the group of stocks covered by PiperJaffray at that time.

46. CW1 confirmed that during this witness's employment, Meridian was unable to grow organically because competition was fierce and Meridian's product line was weak. According to CW1, Meridian operated under Defendant Kraeutler's corporate motto of "pull don't push." Thus, its diagnostic product line consisted almost entirely of "me too" products that were also being sold by competitors for lower prices. CW1 recalled that other problems Meridian had with its product line, including that its products only targeted small niche customers, rather than

appealing to a wider customer base, and there was no cross-selling. These issues consistently caused the Company to miss sales targets. Accordingly, CW1 stated that Meridian was reducing costs in order to still meet earnings targets.

47. Similarly, CW2, a former Director of U.S. Sales at Meridian from January 2015 until March 2017 responsible for training and mobilizing Meridian's sales force, tracking sales, and working with marketing on programs to sell products corroborated CW2's account that at the time this witness joined Meridian in January 2015, the Company was consistently falling short of meeting its internal projections and sales were on a negative trajectory as a result of: (1) fierce competition in the industry, mainly from Becton Dickson and Cepheid; (2) dramatic turnover among the sales force of approximately 50%; and (3) rigid pricing of products where Meridian consistently lost orders to customers because it over-priced its products. CW2 also confirmed that Meridian had been losing significant market share to competitors because its products focused on smaller, niche assays whereas its customers were looking for the broad menu of larger assays on the platform that were being sold by the Company's competitors.

48. The combination of new entrants into the Company's historically strong foodborne franchises and further competition from larger competitors had the Company scrambling at the start of 2016 to explain away the significant decline in the foodborne assay category, a historical source of growth that declined 11% quarter over quarter. As explained by Kurt Kemper of Hilliard in his January 28, 2016 note, "Management has consistently noted this category can be lumpy as the timing of large orders may vary. However, in a change of language, management also noted Meridian's foodborne assays came under competitive pressure. Management pointed to panel-type assays from BioFire Diagnostics, a subsidiary of French diagnostic company BioMérieux that

took market share from the company. Management also pointed to some competition from Alere (ALR - $38.22)."

49. Analysts from Canaccord issued a similar opinion in January 2016, stating that it "remains on the sidelines, though [it] could look to get more constructive in the stock should Meridian 1) demonstrate acceleration in illumigene placements, and/or 2) execute a significant accretive acquisition or merger."

50. These continuous issues looked to only worsen with the upcoming expiration of the Company's *H. Pylori* patent. As Meridian stated in its quarterly report filed on Form 10-Q with the SEC on February 9, 2016:

> The patents for our *H. pylori* products are owned by us and expire in May 2016 in the U.S. and in 2017 in countries outside the U.S. We expect competition with respect to our *H. pylori* products to increase upon the expiration of these patents in 2016 and 2017 as we currently market the only FDA-cleared test to detect *H. pylori* antigen in stool samples. Such competition may have an adverse impact on our selling prices for these products, or our ability to retain business at prices acceptable to us, and consequently, adversely affect our future results of operations and liquidity, including revenues and gross profit. In order to mitigate any loss in revenues upon patent expiration, among other things, we are researching and experimenting with new products (e.g., detection of *H. pylori* on molecular platforms) and attempting to secure significant customers under long-term contracts. We are unable to provide any assurances that we will be successful with any mitigation strategy or that any mitigation strategy will prevent an adverse effect on our future results of operations and liquidity, including revenues and gross profit.

51. Meridian's revenue figures show just how important the *H. Pylori* franchise was to keeping Meridian's diagnostics business afloat:

| Meridian *H. Pylori* Revenue | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Quarter Ended | | | | | | | |
| | **12/31/14** | **3/31/15** | **6/30/15** | **9/30/15** | **12/31/15** | **3/31/16** | **6/30/16** | **9/30/16** |
| *H. Pylori* Diagnostic Revenue | $7,300 | $7,700 | $8,000 | $7,000 | $8,700 | $8,300 | $8,100 | $7,200 |
| Total Diagnostic Revenue (*excluding LeadCare) | $36,586 | $38,662 | $36,049 | $34,817 | $35,301 | $37,354* | $37,523* | $34,936* |
| Percentage of Diagnostic Revenue | 20% | 20% | 22% | 20% | 25% | 22% | 22% | 21% |

52. Importantly, the end-of-patent increase in *H. Pylori* sales was spurred by the Company's abnormal bulk order sales to reference labs – a concerted focus by the Company to secure a final bump before losing exclusivity, which could not be replicated.

53. Concern over the loss of patent reverberated both through the Company and the analyst community, with Meridian stating in its annual report filed with the SEC on November 29, 2016 for the fiscal year-ended September 30, 2016 (the "2016 Form 10-K"):

> The patents for our *H. pylori* products, which represented 15% and 14% of consolidated revenues for fiscal 2016 and fiscal 2015, respectively, are owned by us and expired in May 2016 in the U.S., and will expire in fiscal 2017 in countries outside the U.S. We expect competition with respect to our *H. pylori* products to increase in fiscal 2017 as we currently market the only FDA-cleared tests to detect *H. pylori* antigen in stool samples. Such competition may have an adverse impact on our selling prices for these products or our ability to retain business at prices acceptable to us, and consequently, adversely affect our future results of operations and liquidity, including revenues and gross profit.

54. Analysts from Hilliard recognized the effect of the patent loss, reporting in their January 28, 2016 note, "We continue to believe there will be revenue erosion in the H. Pylori category from patent expiration, which will force Meridian to give up some of the gross margin gains due to the fact that this is a high margin product line."

55. Analysts from William Blair echoed Hilliard's *H. Pylori* concerns in their January 27, 2016 note, stating "we worry about new competitors entering this space later this year."

56. Exacerbating problems was the Company and Defendant Kraeutler's ardent subscription to the dividend policy put into place by Kraeutler's predecessor, William Mott, in 2002, which increased the dividend payout policy for Meridian from 45 to 55% to 75 to 85%. As noted by Kurt Kemper of Hilliard in his August 27, 2015 initiation note on Meridian, "[T]he lack of retention of those profits is of some concern. . . [W]e note a decline in revenues and desire to maintain the dividend can leave VIVO paying out dividends greater than earnings (see FY10 and FY11) and possibly free cash flow."

57. The result was a Company that was left with no real options for organic growth because of its limited R&D budget (since most money was being returned to shareholders through the uncommonly high dividend).

58. Out of options after the failure of illumigene and expiration of the *H. Pylori* patent, Meridian was in desperate need of an acquisition – a fact not lost on the analyst community, with Kurt Kemper of Hilliard stating in his January 28, 2016 note, "Acquisition activity is one potential catalyst for the stock that we believe will happen but do not incorporate in our investment thesis. Based on commentary from management, we believe the appetite is still strong despite the market volatility and competitive pressures."

59. That acquisition would come in the form of Magellan.

### C. MERIDIAN LEVERAGES ITSELF TO ACQUIRE MAGELLAN TO FILL A MUCH-NEEDED VOID

60. Faced with stagnant revenue prospects and a slipping toehold over its historically strong non-molecular diagnostic *H. Pylori* franchise, Meridian needed to make a quickly accretive acquisition.

61. On March 24, 2016, Meridian announced its acquisition of Magellan:

CINCINNATI, March 24, 2016 (GLOBE NEWSWIRE)—Meridian Bioscience, Inc., Cincinnati, Ohio (NASDAQ: VIVO) announced today that it has completed the acquisition of Magellan Biosciences, Inc. and its wholly owned subsidiary Magellan Diagnostics, Inc. Headquartered in Billerica, Massachusetts (near Boston), Magellan pioneered the engineering, development and manufacturing of FDA-cleared products for the testing of blood to diagnose lead poisoning in children and adults.

Today, ***Magellan is the leading provider of point-of-care lead testing systems*** with placements in more than 6,500 physician offices and clinics nationwide. Its position in pediatric offices is particularly strong. LeadCare® II, the only CLIA-waived lead testing system, enables physician practices to enhance the quality of care, improve patient compliance and convenience, and reduce costs. Magellan's LeadCare Ultra® and Plus® systems are designed for use in hospitals and reference labs.

Magellan has a robust product development pipeline and plans to introduce a third generation platform that will include a menu of additional high value CLIA-waived pediatric tests including, but not limited to, lead testing. ***Magellan's talented team of executives and employees led by Amy Winslow, President and Chief Executive Officer of Magellan, will continue to manage the business, which will remain in its current location and facility.***

***From a strategic perspective, the acquisition of Magellan provides (i) an important point-of-care capability***, (ii) ready-made access and expansion of certain of Meridian's products into the pediatric market, (iii) expansion of Magellan's products into international markets where Meridian has a presence, (iv) opportunities within Meridian's hospital market as hospitals acquire physician office practices, and ***(v) a new growth driver as the importance of lead testing and remediation in the United States and global community becomes better understood***.

Magellan was acquired from an investor group including Ampersand Capital Partners as the majority owner, along with Abingworth, Tekla Capital Management and Boston Community Venture Fund. Magellan sales for 2015 were $16 million and the business is growing and profitable. Meridian expects Magellan to be accretive to earnings per share during the second half of calendar 2017. Meridian will finance the purchase price of $66 million using a combination of cash on hand and a $60 million five-year term loan. Meridian remains conservatively capitalized and in a position to maintain its indicated annual cash dividend rate, fund expected growth requirements, and pursue additional acquisitions.

John A. Kraeutler, Chairman and Chief Executive Officer of Meridian, commented, ***"A key underpinning of our diagnostic growth strategies has been to address 'test***

> ***and treat' opportunities by applying highly accurate and simple-to-use tests for rapid diagnoses, thereby enabling appropriate treatment***. Because elevated lead levels can cause serious developmental impairment, especially in young children, the need for broad testing and fast remediation of the contaminated environment is acute. ***Magellan has maintained a clear focus on developing and marketing test systems that are well recognized for their accuracy and ease-of-use***. Further, the Magellan test systems are now in use by more than 10,000 pediatricians, primarily in the U.S. We believe that there is excellent growth potential in Magellan Diagnostics on its own, both with the existing products and the pending new product pipeline. Further, we believe that Meridian and Magellan can leverage their complementary but separate customer channels both in the U.S. and global markets. From the beginning of this process, we have been impressed by the quality of the Magellan team. We believe that the respective company cultures will align very well and, it is our intention to allow Magellan to remain largely autonomous while working closely on strategic opportunities that maximize the strengths of each. We welcome each member of Magellan into the Meridian Bioscience family of companies!"
>
> Amy M. Winslow, President and Chief Executive Officer of Magellan, commented, "By joining forces with Meridian Bioscience, Magellan Diagnostics will better achieve our mission of identifying and protecting the millions of people – primarily children – at risk from the devastating, lifelong effects of lead. Our proprietary sensor-based platform has been refined over the course of a decade and offers unparalleled simplicity as well as the design flexibility to enable menu expansion. Meridian understands the potential of our platform and of our pediatric footprint; the synergies between Meridian and Magellan were clear from the outset, especially our mutual dedication to delivering unique tests that simplify the diagnostic process. Together, we will have a larger presence in both hospital laboratories and in physician offices, both in the U.S. and abroad, to bring our respective products to more patients who need them."
>
> * * *

62. In connection with the acquisition, Meridian recorded more than $42 million in goodwill on its financial statements, representing the amount of consideration paid for Magellan that exceeded its fair market value:

> As a result of the consideration paid exceeding the preliminary fair value of the net assets acquired, goodwill in the amount of $42,730 was recorded in connection with this acquisition, none of which will be deductible for tax purposes. This goodwill results largely from the addition of Magellan's complementary customer base and distribution channels, industry reputation in the U.S. as a leader in lead testing, and management talent and workforce. Our Condensed Consolidated Statements of Operations for the three and six months ended March 31, 2016 include $1,173 of

> transaction costs related to the Magellan acquisition, which are reflected as Operating Expenses.

63. At the September 7, 2016 Robert W. Baird Global Healthcare Conference, Defendant Kraeutler lauded the acquisition as already paying early dividends for Meridian:

> We expected Magellan to be slightly dilutive this year, and it looks like Magellan, barring the one-time charges, is actually going to be slightly accretive this year.
>
> So Magellan currently is running ahead of expectations. We have not articulated at what rate, ***but they are beating their plan month by month***. So we think it's going quite well.
>
> ***You asked about the integration. Magellan is essentially a turnkey for us***. They use a sensor-based diagnostic technology, which means that it's different from Meridian's other seven or eight diagnostic platforms. And if you went to Magellan's facility, you would see it is primarily a production facility. So relatively [low] G&A overhead and a very, very fine-tuned production facility.
>
> Our expectation is that probably within three years, we're going to have to build out in that space for additional production. And if China opens up -- which will not be in our guidance, but if China opens up, we might have to move faster on that.
>
> So I think it's going extremely well. The management teams have worked well together. We have really yet to explore the leverage potential.

### 1. Magellan Is a Major Player in the Lead Testing Area

64. Magellan traces its roots in the lead diagnostics space back to the late 1960s when the company, then called ESA, Inc., designed and built a bench top analyzer for the measurement of lead in blood, thus moving these tests from the traditional reference laboratories to the point-of-care. In 2004, private equity firm Ampersand Capital Partners invested in Magellan, ultimately becoming its majority owner by the time of the Merger. Yet, throughout that period Magellan did not stray from its primary focus: diagnostics products for blood lead levels through its LeadCare products.

65. Magellan launched its first LeadCare system in 1997 for "field use in health clinics," which prioritized bringing the ability to test blood levels outside of a lab in order to more

efficiently test blood levels and collect results. In 2001, the Company received funding from the CDC in order to begin development of the LeadCare II system, which aimed to increase its accessibility to patients by offering clinicians a low cost, in-house option for lead level testing. In 2006, Magellan launched the LeadCare II system and received a CLIA[3] waiver, which would decrease the need for any specialized staff or training with regard to handling the product and testing. The test itself only requires two drops of blood in the sample and produces results within three minutes.

66. In a March 27, 2016 research note following Meridian's acquisition of Magellan, Canaccord applauded the technology as being among the best in the industry:

> Magellan's LeadCare II is the only FDA approved, CLIA-waived lead poisoning platform/test available on the market, and is targeted primarily at pediatric physician's practices (~6,500 placements are used by > 10K US pediatricians). The test requires just 2 drops of blood, 50 μL, and returns results in 3 minutes. The instrument is small in size, roughly the size of an iPad. The product is very easy to use and consumables do not require refrigeration. As shown below, results are shown quantitatively on the screen. The 3 minute turnaround time compares to turnaround times of ~2-14 days using conventional methods, which can assume several lag effects in the ordering, test results, and follow-up process between the lab, physician and patient.

67. Building on the LeadCare II product, in August 2013, Magellan announced the FDA's clearance for LeadCare Ultra – the first "plug-and-play" benchtop clinical lead analyzer used primarily by hospitals and reference labs that offered high-throughput testing through its 6 channels that are purportedly capable of running up to 90 samples in 1 hour.

68. In July 2015, the Company announced its receipt of FDA clearance of its LeadCare Plus product – purportedly "the simplest way to perform laboratory lead analysis with the most

---

[3] "CLIA" refers to "Clinical Laboratory Improvement Amendments of 1988," which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States, except clinical trials and basic research.

compact footprint." This single channel, low throughput device purportedly provided accurate results in just 3 minutes.

69. While the products' outward designs may have been slightly different, each of Magellan's LeadCare products was based on the same technology that purportedly allowed for quick diagnoses to be made at the point of care (*i.e.* in a doctor's office) versus having to send a blood sample to the laboratory for traditional, lengthy testing.

**2. Proactive Point of Care Testing is Critical for Early Detection and Prevention of Life-Threatening Conditions Associated with Lead Poisoning**

70. In the last decade, lead testing for the most vulnerable members of society (children, nursing and expecting mothers, and the elderly) has risen to the public consciousness, particularly in response to the public outcry over insufficient water treatment in Flint, Michigan – a national disaster that led to over 100,000 residents potentially exposed to high levels of lead in their drinking water

71. This was not a Flint-specific problem as, according to the CDC, at least 4 million households nationwide have children living in them that are being exposed to high levels of lead. Of that number, half a million U.S. children, ages 1-5, are living with blood lead levels of about 5 micrograms per deciliter (µg/dL), despite there being no identifiable safe blood lead level in children at this time.

72. High blood levels in children negatively impacts a child's developing brain and nervous system, sometimes permanently. The CDC has warned that lead in a child's body can: (i) slow down growth and development; (ii) damage hearing and speech; and (iii) make it difficult for the affected child to pay attention and learn. As most children who have lead poisoning do not look or act sick, the need for proactive testing is paramount.

73. Further, a recent study claims lead exposure causes 10 times more deaths in the United States than previously thought.[4] The deaths of as many as 610,000 Americans that were originally thought to be linked to heart disease are now blamed on lead exposure. This study suggests of the 2-3 million deaths every year in the USA are attributable to lead exposure.

74. Critically, even low level lead exposure is an important and largely overlooked risk factor for death in the USA. Preceding death, lead exposure can greatly debilitate the body's systems, affecting the nervous and gastrointestinal systems and can cause renal failure. It has also been linked to high blood pressure and heart failure.

75. Yet, it is not just contaminated drinking water that causes lead poisoning. According to the CDC, most children get lead poisoning from paint in homes built before 1978, as when the paint cracks and peels, it creates a dangerous dust that settles over everything a child touches and is then breathed or ingested.

76. Point of care (POC) testing for blood lead levels is an important gateway to further increased compliance for blood lead level testing and detection of the risks posed by elevated blood lead levels. Prior to and during the Class Period, Magellan manufactured the only approved POC blood lead level test.

77. Point of care testing refers to testing in the same location where the patient is being seen. The sample is collected, analyzed, and the results are all delivered in the same location and at the same time the patient is being evaluated. This differs from previous testing procedures which called for off-site laboratory testing.

[4] *Low-level lead exposure and mortality in US adults; a population-based cohort study*, The Lancet Public Health Journal, 12 March 2018 (Vol.3, No.4), http://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(18)30025-2/fulltext

78. The POC method for blood lead level testing is achieved through anodic stripping voltammetry (ASV) in which a sample of blood is collected from the patient through a venous or capillary draw. Once collected, it is mixed with the testing reagents and placed in the POC testing device. Through ASV, the device measures the blood lead level by "measuring the electric current needed to oxidize lead in blood." These results are displayed by the POC testing device and directly inform the clinician of the blood lead level.

79. This method has numerous benefits, most importantly the convenience to both patients and clinicians and the rapidity with which they receive results. Under FDA guidance, any laboratory testing on humans is regarded through Clinical Laboratory Improvement Amendments (CLIA). If any of these tests or methods require some degree of proficiency or proficiency training for the clinician to perform them, they require CLIA certification and are further regulated by the FDA to abide by their designated certification. This ensures the ongoing reliability of these testing procedures.

80. POC methods and devices do not require such proficiency and are therefore granted CLIA waivers, making them easier to utilize within a medical office or clinic setting and incredibly accessible to patients. The entire procedure is meant to take place within the length of an office visit and to negate the need, at least initially, to send out blood samples to an external facility for testing. The ease with which the clinician can perform the procedure and the almost instantaneous results feedback have increased the likelihood of more patients seeking out blood lead level testing. This leads to increased rates of screening and quicker and earlier detection of elevated blood lead levels as well as blood lead level testing compliance amongst patients.

81. By definition POC testing systems are meant to deliver test results both efficiently and with convenience. However, they are only meant to screen for elevated blood levels and act

as an initial step in the process to fully detect and treat the issue. If the blood lead level is below the reference value (5µgldL), no further testing is necessary. If it climbs above the reference value, the patient and/or family will be informed and advised to take a confirmatory test, which would be followed up by treatment for the condition.

82. Given the vital importance of this initial screening step, particularly as the primary focus of these lead tests is on the most vulnerable members of our society, any underestimation of blood lead levels (which would then lead to the clinician determining further testing or screening was unnecessary) would be catastrophic. Unfortunately for the young children, pregnant women, and nursing mothers who relied on test results from LeadCare products using vein-drawn blood, that was precisely what occurred here – and all the while Defendants were aware of the issue and attempted to conceal it from the FDA and the public at large.

### 3. At all Relevant Times, the LeadCare Products Were Subject to Strict FDA Regulation

83. The FDA is a federal agency of the United States Department of Health and Human Services tasked with protecting and promoting public health through the control and supervision of, *inter alia*, food safety, tobacco products, dietary supplements, prescription and over-the-counter pharmaceutical drugs, vaccines, and medical devices.

84. Medical devices fall under the auspices of the FDA pursuant to section 201(h) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(h) (the "FFDCA"), when they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.

85. The FDA categorizes medical devices into one of three classes (Class I, II, and III) based on their risks and regulatory controls necessary to provide a reasonable assurance of safety

and effectiveness. Class I devices generally pose the lowest risk to the patient and/or user and Class III devices pose the highest risk.

86. Class I and II devices only require clearance from the FDA prior to their rollout through a premarket notification 510(k). A 510(k) notification is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 C.F.R. § 807.92(a)(3)) that is not subject to Premarket Approval ("PMA") application. Submitters must compare their device to one or more similar legally marketed devices and make and support their substantial equivalence claims.

87. Class III are subject to approval of a PMA application – scientific, regulatory documentation that demonstrates the safety and effectiveness of the device.

88. The FDA also closely regulates the branding and labeling of medical devices under section 502 of the FFDCA, 21 U.S.C. § 352(o), requiring notice of an intent to introduce medical devices into commercial distribution. The FDA further requires notice of any modification to any previously-approved device, as required by section 510(k) of the FFDCA, 21 U.S.C. § 360(k), and 21 C.F.R. § 807.81(a)(3). In particular, these modifications include any changes to labeling instructions, especially those that could significantly affect the safety or effectiveness of the device, which would then require the submission of a new 510(k) application.

89. At all times relevant hereto, the LeadCare II, LeadCare Ultra, and LeadCare Plus systems were subject to FDA regulation as Class II medical devices.

### D. DEFENDANTS CONCEAL FROM THE FDA AND THE INVESTING PUBLIC THAT THE LEADCARE SYSTEMS WERE PRODUCING FAULTY TEST RESULTS IN MILLIONS OF PATIENTS FOR MORE THAN THREE YEARS[5]

90. As would come to light on June 29, 2017, when the FDA issued its Form 483 site inspection report to Meridian-owned Magellan (which was not publicly disclosed to investors until July 13, 2017) (the "Form 483"), Defendants concealed from the FDA numerous regulatory violations and defects in the LeadCare products, which caused faulty test results over the course of several years. These faulty test results jeopardized the lives of *millions* of patients as an estimated 8 million individuals were tested via a LeadCare product between 2014 and 2017.

91. As alleged herein, Defendants held out the LeadCare products as providing an immediate analysis of blood lead levels after thoroughly mixing the blood treatment reagent mixture. However, Magellan's validation studies ***never actually tested*** under these conditions to ensure the products were capable of performing as anticipated.

92. In September 2013, Magellan conducted a study titled "Blood Treatment in Reagent Stability Study" (the "Reagent Study") relating to the LeadCare Ultra system, which concluded that there was a "reproducible trend of increased Pb [Lead] signal with increased Sample/Treatment Reagent incubation time." Thus, the Reagent Study was clear, showing that the accuracy of the LeadCare Ultra test increased when the reagent was allowed an incubation period (later determined by Magellan to be 24 hours), yet no such mention of this required incubation period was included in Magellan's original instructions or labeling, as the extended incubation period directly contradicted the intended use of LeadCare Ultra (and the entire

[5] The facts set forth herein are alleged upon information and belief and are based on, *inter alia*, the findings of the FDA, as published in the Form 483.

LeadCare product line) by doctors and clinicians: to provide immediate analysis after mixing the blood treatment reagent mixture.

93. Despite the fact that Magellan observed that the LeadCare Ultra system reported artificially low amounts of lead in the blood, requiring a longer incubation period to increase its accuracy and thus, did not conform to the intended use of the product, Magellan pushed forward with the commercial distribution of the LeadCare Ultra system in November 2013 without ever implementing a change to include incubation time in its labeling and use instructions or informing the FDA of a potential change in its 510(k) application.

94. As was to be expected given that the end-users of the LeadCare Ultra system were unaware of the required incubation times, Magellan began receiving complaints. On August 13, 2014, Magellan received two separate complaints related to the underestimation of blood lead results by the LeadCare Ultra system (Customer Complaint Case #s 00110598 and 00110639). Despite Magellan's own procedure titled "Adverse Events Procedure", SOP 108, Rev 4, which states that a Medical Device Report ("MDR") will be ***sent to the FDA within 30 days*** of the company becoming aware, and the FDA's own mandatory 30 day reporting period pursuant to 21 C.F.R. § 803, a single device malfunction MDR was not submitted for both complaints until April 2, 2015 – 201 calendar days later.

95. Further, Magellan was made aware of the fact that the incubation period did not conform with the intended use of the product by at least two separate complaints from healthcare providers (Complaint Case #00112233, dated 10/28/14, and #00119771, dated 9/9/15), yet made no report to the FDA.

96. Magellan continued to conceal its device malfunctions, even though it was receiving new complaints at an increasing rate and subjecting unknown test recipients to

potentially dangerous health conditions. On October 23, 2014, Magellan received a customer complaint involving 8 events with 8 different patients involving the underestimation of blood lead results from the LeadCare Ultra system when compared to the results obtained from another blood analyzer (Customer Complaint # 00112168). As of June 15, 2017, no MDR was ever submitted to the FDA for this complaint.

97. As a result of the underestimation issue with LeadCare Ultra, in November 2014 Magellan opened an internal Corrective Action Request ("CAR") 108[6] to investigate underestimations within the Company's LeadCare II, Ultra, and Plus systems. In connection with CAR 108, on November 24, 2014, Magellan issued a "Notice to Customers" letter instructing them to incubate the blood-treatment reagent mixture for at least 24 hours prior to testing in the LeadCare Ultra system to prevent underestimation of the lead concentration in the sample. Pursuant to 21 C.F.R. § 820.100(a)(7), this corrective action was necessarily submitted for "***management review***," including by Magellan CEO Amy Winslow, prior to its implementation. As found by the FDA, Magellan failed to validate this 24 hour incubation period to ensure that the

[6] A medical device manufacturer is required to establish and maintain procedures for implementing corrective and preventive action pursuant to 21 C.F.R. § 820.100(a). The regulation further mandates that the procedures include requirements for: "(1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems; (2) Investigating the cause of nonconformities relating to product, processes, and the quality system; (3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems; (4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; (5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems; (6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and (7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for ***management review***." 21 C.F.R. § 820.100(b) mandates that "[a]ll activities required under this section, and their results, shall be documented."

design change met the intended use of the device (accurate lead level testing), as well as the needs of the user (point-of-care immediate analysis ability). A copy of this letter was included in Magellan's April 2015 MDR, however Magellan did not timely report this corrective action or change to the FDA, despite being required to: (i) report any corrective action within 10 days by 21 C.F.R. § 806.10; and (ii) submit any notice or other information respecting the modification of a medical device to the FDA pursuant to section 510(k) of the FFDCA, 21 U.S.C. § 360(k), and 21 C.F.R. § 807.81(a)(3).

98. On May 4, 2015, Magellan received Customer Complaint Case # 00116937 related to the underestimation of blood lead levels by a customer using the LeadCare Ultra system. Despite the fact that this complaint was received *after* the Company's notice to customers regarding the 24 hour incubation period, Magellan made no efforts to validate the efficacy of its incubation period. The Company later claimed to have initiated CAR 1223 and CAR 1229 to conduct studies to verify that the 24 hour incubation period of the blood-treatment reagent mixture was an effective mitigation to prevent the underestimation issue, but these studies were purportedly "not well documented" – action that necessarily would have been approved by Winslow under 21 C.F.R. § 820.100(a)(7), violative of 21 C.F.R. § 820.100(b) to the extent such action was not documented, and which the FDA found to be inadequate in the October 23 FDA Warning Letter."

99. On May 5, 2015, Magellan opened Engineering Change Order ("ECO")[7] #6944 to revise the LeadCare Plus labeling to include a 24 hour incubation period. Therein, Magellan claimed that this change did not require validation/verification of the product/process despite the fact that a similar ECO for the same change to LeadCare Ultra (ECO # 6968) was determined to

[7] An ECO is an essential manufacturing process used to address changes in, *inter alia*, components, assemblies, or documents such as processes and work instructions.

be one that "does significantly affect the form, fit, function, or regulatory status of the product" and one that "may affect product performance." Additionally, any claim that the 24 hour incubation period was in fact validated by Magellan is belied by the fact that the ECO references Validation Report 157 – a validation study that Magellan management confirmed to the FDA was cancelled. Further, Magellan's own September 2013 "Blood Treatment in Reagent Stability Study" concluded that a "change of instruction to include incubation time would require resubmitting data to the FDA." Yet Magellan did not report these changes to the FDA.

100. It was also around this point that Magellan sent a complaint to Becton Dickinson, complaining of an observed negative bias in test results obtained from Magellan's devices when using blood collected in BD Vacutainer K2EDTA tubes.

101. On August 4, 2015 Magellan opened ECO #6968 to revise LeadCare Ultra's labeling to include a 24 hour incubation period. Despite noting that the change "does significantly affect the form, fit, function, or regulatory statute of the product" and that it "may affect product performance," Magellan indicated that the change did not require validation/verification of the product/process and did not report the change to the FDA.

102. As illustrated above, between September 2013 and the end of Magellan's independent existence in March 2016, there were myriad documented complaints and internal reports regarding the lead level underestimation issue with the LeadCare family of products, each of which were necessarily reported to Magellan management for review pursuant to 21 C.F.R. § 820.100(a)(7)[8], and which Meridian admittedly became aware of during its due diligence process.

[8] Subsection (a)(7) requires that all procedures for implementing corrective and preventative action include a requirement for the submission of relevant information on identified quality problems, as well as corrective and preventive action, for management review.

As stated in the Representations and Warranties Section of Merger Agreement between Magellan and Meridian, executed by Individual Defendant Kraeutler on behalf of Meridian:

> (g) The Company[9] has made available to Parent all material reports, documents, claims, notices, filings, minutes, transcripts, recordings and other material correspondence between the Target Company Group, on the one hand, and any Healthcare Regulatory Authority,[10] on the other hand, since January 1, 2013.
>
> (h) All material reports, documents, claims, applicable registration files and dossiers, notices and similar filings required to be filed, maintained, or furnished to any Healthcare Regulatory Authority by the Target Company Group since January 1, 2010 have been so filed, maintained or furnished and, to the Company's Knowledge, were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).
>
> (i) All clinical testing conducted by or on behalf of the Target Company Group is being conducted in accordance with the Clinical Laboratory Improvement Amendments of 1988, 42 U.S.C. § 263a et seq.

103. Similarly, in Section 4.07 of the Merger Agreement, Defendants confirmed that Meridian conducted its own investigation in consultation with expert advisors and has made the informed decision to move forward with the acquisition of Magellan:

> Section 4.07 Inspection. Each of Parent and Merger Sub is an informed and sophisticated Person, and has engaged expert advisors experienced in the evaluation and acquisition of companies such as the Company and its Subsidiaries as contemplated hereunder. ***Each of Parent and Merger Sub has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby***. Parent and Merger Sub acknowledge and agree that they are relying exclusively on the representations set forth in Article III ***and their own examination and investigation*** of the Company and that they are not relying on any other statements or documents.

---

[9] When quoting the Merger Agreement, "Company" refers to Magellan, "Parent" to Meridian, and "Target Company Group" to Magellan and all of its subsidiaries.

[10] The Merger Agreement defines "Healthcare Regulatory Authority" to include the FDA, Centers for Medicare & Medicaid Services, federally recognized but privately operating accrediting organizations, or any other federal, state, local or foreign Governmental Authority, including such entities that are concerned with or regulate public health care programs.

104. According to CW1, who worked on systems integration for the Company's prior acquisition of BioLine in 2010 before transitioning to Commercial Operations, Defendants Kraeutler and Lueke, as well as Rick Eberly, Meridian's former Executive Vice President and Chief Commercial Officer, Bryan Baldasare, Meridian's current Corporate Controller and Treasurer, and Susan Rolih, Meridian's EVP of Global and Regulatory Affairs and Quality Assurance were the "small group" of people who were mainly responsible for conducting due diligence in connection with Company acquisitions. Moreover, CW1 recalled that Susan Rolih went on site to Magellan prior to the March 2016 acquisition to conduct diligence relating to regulatory compliance. According to CW1, and consistent with the Section 4.07 of the Merger Agreement, during Ms. Rolih's site visits, she would have reviewed, among other information, Magellan's correspondence with the FDA and customer complaints related to its LeadCare products.

105. Defendants' knowledge of the LeadCare issues and concealment of these issues from the FDA and investors continued throughout the Class Period.

106. On November 4, 2016, Magellan, now a subsidiary of Meridian, sent a "Notice to Customers" letter instructing them to implement a 4-hour incubation of the blood-treatment mixture for venous blood samples tested on the LeadCare II system. Neither Magellan nor Meridian sent a notice of this device correction to the FDA within ten days of initiating the correction, per Magellan's "Field Corrective Action Procedure", SOP 106, Rev. 1 or FDA requirements under the FFDCA and 21 C.F.R. § 803.1.

107. The November 4, 2016 letter to customers specifically identified the BD K2EDTA Vacutainer tube and their rubber stoppers as the culprit for lead level underestimations in the LeadCare II product.

108. On November 17, 2016, Magellan opened ECO # 7060 to revise the labeling for LeadCare II to include an incubation time of four hours. Yet in the accompanying documentation, Magellan indicated that it was not required to validate or verify the four-hour incubation period, despite the fact that the November 4, 2016 letter to customers stated, with respect to the four hour period, Magellan has "determined that this length of time is sufficient to mitigate the effects of rubber stopper exposure" and that the labeling change made as a result of the November 17th ECO was classified as one that "affects the design, production or assessment of product form, fit, or function" on Form 123-04.

109. Further, with respect to this ECO, on Form 123-05, "Regulatory Decision", Rev 00, Magellan documented in the "Decision Summary" section that the change was classified in a manner that required submission(s) to the FDA prior to implementation, yet the Company ignored the instruction to "complete a 510(k) Notification and Technical File as required" and instead pushed forth with its unilateral and insufficient incubation notification process, all the while withholding notification from the FDA.

110. On January 13, 2017, Magellan received Customer Complaint Case # 00132411 involving five events of lead level underestimation with five different patients using the LeadCare Ultra system ***and the recommended twenty-four hour incubation period***, yet Defendants continued to conceal these complaints from the FDA and investors.

111. Despite confirming the validity of this new complaint and the fact that it directly showed the 24 hour mitigation efforts were unsuccessful, Magellan closed CAR 108 on March 21, 2017.

### E. Defendants Were Aware of the Class Period Complaints and Other Regulatory Violations Through Monthly and Quarterly Business Reviews and Other Meetings They Attended

112. During CW2's employment in Commercial Operations, this witness attended monthly Business Review meetings usually held the second week of the month at the Innovation Center conference room at the Company's headquarters in Cincinnati, Ohio. The purpose of the monthly Sales and Marketing Review meetings, which were attended by the Individual Defendants and all vice presidents and directors of sales and marketing, quality assurance and research and development comprising about 30 to 40 employees was to, among other things, discuss the Company's: (i) sales performance in the prior month by region, territory and product line; (ii) forecasts and strategy going forward; and (iii) marketing program. CW2 stated that the head of each business unit was responsible for providing this information for their particular business unit to be input into a PowerPoint presentation that was then provided to all participants at each monthly meeting.

113. CW2 confirmed that Meridian held monthly Business Review meetings called "Flash Calls" the first Thursday of every month at the Company's corporate headquarters in Ohio, which were attended by all employees director level and above. CW2 recalled that Amy Winslow, head of Magellan, attended these meetings by telephone. At the monthly Business Review meetings, each business unit head would discuss the current month's performance and outlook, as presented in a PowerPoint presentation at the meeting.

114. Moreover, Defendants' own disclosures confirmed that the Individual Defendants reviewed Magellan's performance on a monthly basis. For example, Defendant Kraeutler reported at the September 2016 Robert W. Baird Global Healthcare Conference that Magellan was "beating

their plan month by month" and that the integration was "turnkey." Kraeutler further elaborated on Magellan's technology as being "sensor-based," unlike Meridian's.

115. According to CW1, Meridian also held quarterly Research and Development meetings, which were attended by Defendant Kraeutler, CW1 and other business unit heads, where customer complaints, the nature of the complaints, product quality statistics and other information was presented in a PowerPoint presentation and discussed. CW2 similarly recalled quarterly business review meetings that the Individual Defendants and other business units heads attended in person to discuss Company performance. While Magellan employees did not attend this quarterly business review meeting, it may be inferred that Meridian had a similar meeting to discuss Magellan's quarterly performance, particularly given Meridian's own disclosures and the importance of this new product line to the Company's business and viability.

116. According to CW1, every director-and-higher employee was required to review any Meridian SEC filing prior to its filing and sign off on the accuracy of those portions pertinent to his/her business function.

117. Additionally, CW2 states that customer complaints at Meridian were typically noted in the customer account profile in the notes field in the Company's Sales Logics software system. Thus, as evidenced by CW2's statements and the other allegations set forth herein (including the January 2017 intake of a customer complaint regarding the LeadCare Ultra product misstating lead levels in five different individuals despite the clinician's implementation of the incubation period and the subsequent February 2017 confirmation of that complaint by a Magellan employee, as indicated in the notes field), this information was readily available to the Individual Defendants during the Class Period.

### F. THE FDA UNCOVERS YEARS' OF CUSTOMER COMPLAINTS AND REGULATORY VIOLATIONS DURING ITS SITE INSPECTION AND DEFENDANT KRAEUTLER ANNOUNCES HIS RETIREMENT

118. On May 10, 2017, the FDA commenced its site inspection of the Billerica, Massachusetts facility. The FDA's inspection would span fifteen days: 5/10/2017; 5/11/2017; 5/15/2017; 5/16/2017; 5/17/2017; 5/18/2017; 5/19/2017; 5/22/2017; 5/30/2017; 5/31/2017; 6/1/2017; 6/8/2017; 6/13/2017; 6/15/2017; 6/29/2017.

119. As would only be made public later in the Class Period, the FDA Inspection revealed that Defendants had been concealing years of customer complaints regarding the underestimation of lead levels by both the LeadCare II and LeadCare Ultra products and regulatory violations related to the Company's improper, unvalidated, and unreported implementation of incubation periods across the various LeadCare products, all despite their knowledge that such changes would require FDA approval or otherwise required notification to the FDA. These violations were a national public health concern prompting the FDA to immediately issue an injunction to discontinue the use of all of Defendants' LeadCare products for venous blood testing, with the CDC joining the FDA in its issuance of a national warning.

120. In fact, it was estimated that as many as ***8 million blood tests*** were run through the LeadCare family of products from 2014 to 2017, with millions impacted by the underestimation issue who would require retesting.

121. Thus, given the severity and magnitude of the issue, it came as no surprise that the FDA classified the LeadCare, LeadCare II, LeadCare Ultra, and LeadCare Plus recalls as Class I. Class I recalls are the highest level based on the hazard involved and are, according to the FDA, reserved for "dangerous or defective products that predictably could cause serious health problems or death."

122. The FDA and CDC's announcement led to the June 29, 2017 joint letter from twelve United States senators to the commissioner of the FDA and the acting director of the CDC seeking greater clarity on the agencies' efforts to combat the underestimation issue. This letter succinctly summarized the Defendants' inaction:

> Reports indicate that Magellan was aware of problems with the accuracy of their tests as early as 2014, yet for three years, parents, children, and providers continued to base healthcare decision on these inaccurate test results. . . It is alarming whenever a diagnostic test is found to be inaccurate, but even more so when children are the predominant population for whom the test is used.

123. Unsurprisingly given the expected public backlash, on the same day that the FDA commenced its site inspection (May 10, 2017), Meridian announced that it would commence a search for a new chief executive officer in conjunction with the purportedly planned retirement of Defendant Kraeutler.

124. Despite the Company's efforts to paint Defendant Kraeutler's departure as occurring in the regular course and planned in advance, Defendant Kraeutler had signed a new employment agreement (the "Third Amended Employment Agreement") on October 3, 2016 that contemplated his remaining employed with the Company through September 30, 2018.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

125. Throughout the Class Period, Defendants made materially false and misleading statements about the Company, Magellan, and its LeadCare family of products which materially altered the total mix of information in the market. These statements were made in Company press releases, SEC filings, and presentations by members of Meridian's management team and concerned, *inter alia*: (1) Meridian's compliance with applicable FDA and other governmental regulations relating to Magellan's LeadCare diagnostics products; (2) the efficacy of Magellan's LeadCare products; and (3) the adequacy of Meridian's internal controls.

### A. Materially False and Misleading Statements About Compliance of the LeadCare Products with FDA and Government Regulations

126. Meridian's false statements about Magellan's products began on March 24, 2016 when the Company issued a press release (the "March 24 Press Release") announcing the acquisition of Magellan.

127. Therein, Defendants falsely claimed that the LeadCare products were approved by the FDA, stating the Company was "pioneer[ing] the engineering, development and manufacturing of ***FDA-cleared products*** for the testing of blood to diagnose lead poisoning in children and adults." This press release was also filed as an exhibit to a Form 8-K filed by the Company with the SEC on March 24, 2016 and signed by Defendant Lueke as Meridian Executive Vice President and CFO.

128. On the news, the Company's common stock increased from a closing price of $19.56 on March 24, 2016 to $20.41 on March 28, 2016 (the first trading day following the announcement), and $21.21 on March 29, 2016, representing a one day increase of 4.35% and a two-day increase of 8.4%.

129. Additionally, throughout the Class Period, Defendants made the following nearly identical statement in Meridian's SEC filings:

> Headquartered near Boston, Massachusetts, Magellan is a leading manufacturer of ***FDA-cleared products*** for the testing of blood to diagnose lead poisoning in children and adults. Magellan is the leading provider of ***point-of-care*** lead testing systems in the U.S.

130. Specifically, this identical statement appears in the following Class Period SEC filings:

- The May 2016 10-Q;

- The August 9, 2016 quarterly report for the quarter ended June 30, 2016 on Form 10-Q (the "August 2016 10-Q"), signed by Defendant Lueke as Executive Vice President and Chief Financial Officer of the Company;
- The November 29, 2016 annual report for the fiscal year ended September 30, 2016 on Form 10-K (the "2016 Form 10-K"), signed by Defendant Kraeutler as Chairman of the Board and Chief Executive Officer, Defendant Lueke as Executive Vice President and Chief Financial officer of the Company, and five non-party directors of the Company;
- The quarterly report for the quarter ended December 31, 2016, filed with the SEC on Form 10-Q on February 9, 2017 (the "February 2017 10-Q"), signed by Defendant Lueke as Executive Vice President and Chief Financial Officer; and
- The quarterly report for the quarter ended March 31, 2017, filed with the SEC on Form 10-Q on May 10, 2017 (the "May 2017 10-Q"), signed by Defendant Lueke as Executive Vice President and Chief Financial Officer.

131. Defendants' perpetuation of the false impression that LeadCare products were in compliance with FDA regulations continued when, on May 6, 2016, the Company filed its quarterly report for the quarter ended March 31, 2016 on Form 10-Q (the "May 2016 10-Q"), signed by Defendant Lueke as Executive Vice President and Chief Financial Officer of the Company. Attached thereto as Exhibit 10.1 was a copy of the Agreement and Plan of Merger, dated March 24, 2016, through which Meridian acquired Magellan (the "Merger Agreement"), as signed by Defendant Kraeutler on behalf of the Company.

132. The Merger Agreement was false and misleading as it claimed in the Representations and Warranties Section that:

> (h) All material reports, documents, claims, applicable registration files and dossiers, notices and similar filings required to be filed, maintained, or furnished to any Healthcare Regulatory Authority by the Target Company Group since January 1, 2010 ***have been so filed***, maintained or furnished and, to the Company's Knowledge, were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).
>
> (i) All clinical testing conducted by or on behalf of the Target Company Group is being conducted in accordance with the Clinical Laboratory Improvement Amendments of 1988, 42 U.S.C. § 263a et seq.

133. These statements contained in the Merger Agreement were false and misleading when made as they inaccurately portrayed Magellan as being in compliance with all FDA regulations, when, in actuality, the Company had regularly violated its own protocol and FDA requirements by failing to notify the regulatory agency of material changes in its LeadCare devices, as well as the known yet undisclosed LeadCare product issues that were impacting millions of children across the country.

134. Further, in the 2016 Form 10-K, signed by Defendant Kraeutler as Chairman of the Board and Chief Executive Officer and Defendant Lueke as Executive Vice President and Chief Financial Officer, Defendants affirmatively misrepresented the status of the Company's diagnostic product portfolio (including the LeadCare products), by claiming, "[e]ach of the diagnostic products currently marketed by us in the United States has been cleared by the FDA pursuant to the 510(k) clearance process or is exempt from such requirements."

135. The above statements were materially false and misleading when made because: (i) the LeadCare II and LeadCare Ultra products were adulterated under the FFDCA; (ii) Defendants had concealed numerous customer complaints and label changes regarding the tests' underestimation of lead from the FDA; (iii) Defendants had not even tested the incubation periods

proposed to customers and, thus, did not even know if they were compliant with applicable regulations; (iv) Defendants made numerous changes to the product labels and instructions, which they had concealed from the FDA in violation of FDA regulations; (v) Defendants failed to follow proper FDA procedure with respect to design validation, device reporting, and labeling and instruction changes; (vi) the LeadCare II and LeadCare Ultra products were not capable of point-of-care testing as they required lengthy incubation periods to offset the dangerous risk of lead level underestimation and, thus (vii) the LeadCare II and LeadCare Ultra products were not FDA-cleared and the Company was not in compliance with applicable regulations.

### B. MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING THE EFFICACY OF LEADCARE PRODUCTS

136. The March 24 Press Release further touted Magellan as "the leading provider of ***point-of-care lead testing systems,***" the acquisition of which provided to Meridian "an important point-of-care capability." The importance of point-of-care capabilities was not lost on Defendant Kraeutler who is quoted in the March 24 Press Release as stating, "[a] key underpinning of our diagnostic growth strategies has been to address 'test and treat' opportunities by applying ***highly accurate*** and ***simple-to-use tests for rapid diagnoses***, thereby enabling appropriate treatment. Because elevated lead levels can cause serious developmental impairment, especially in young children, the need for broad testing and fast remediation of the contaminated environment is acute. Magellan has maintained a clear focus on developing and marketing test systems that are well recognized for their ***accuracy and ease-of-use***."

137. The March 24 Press Release was also incorporated by reference and filed with the SEC as an exhibit to a Form 8-K on March 24, 2016, signed by Defendant Lueke.

138. Similarly, in the 2016 Form 10-K, the Company stated, "[o]ur diagnostic products provide accuracy, simplicity and speed; enable early diagnosis and treatment of common,

acute medical conditions; and provide for better patient outcomes at reduced costs. . . Our diagnostics products also include Magellan's LeadCare brand of tests for quantitative determination of blood lead levels."

139. These statements were materially false and misleading when made because, *inter alia*: (i) the LeadCare II, LeadCare Plus, and LeadCare Ultra testing systems suffered from serious known design flaws that required the incubation of blood for up to twenty-four hours in order to produce accurate results; (ii) as a result of (i), these lead testing products were not "point-of-care;" (iii) prior studies, including the Reagent Study in 2013 demonstrated there was a "reproducible trend of increased Pb [Lead] signal with increased Sample/Treatment Reagent incubation time"; (iv) Defendants had received numerous customer complaints reporting under-estimation of lead levels; and, thus, (v) the tests were not "highly accurate," nor were they easy to use. Instead, as the FDA would later reveal, it was *impossible* for these LeadCare products to be both highly accurate and rapid when testing blood drawn from the vein.

140. On October 18, 2016, the Company issued a press release titled "Meridian Bioscience, Inc. Comments on Preliminary Fiscal 2016 Operating results and Provides Fiscal 2017 Revenue and Earnings Guidance" (the "October 18 Press Release"). The October 18 Press Release was also filed as an exhibit to the Form 8-K filed by the Company with the SEC on October 20, 2017 and signed by Defendant Lueke as Executive Vice President and CFO. With respect to Magellan, the October 18 Press Release states:

> Our recent acquisition of Magellan has gone well. Magellan performed above revenue expectations and is expected to be a penny dilutive to earnings per share for the six months since the acquisition, also better than expected.

141. Defendant Kraeutler is also quoted in the October 18 Press Release as stating:

> Magellan Diagnostics, acquired in March of 2016 and included in our Diagnostics Segment, has exceeded expectations thus far. For fiscal 2017, we are expecting low double-digit revenue growth on a normalized annual basis from continued

> success in placing the LeadCare II platform in the domestic market. Expansion into international markets, including China following the recent CDFA approval of LeadCare II, is expected to contribute to revenues and may generate revenue upside. Capitalizing on the increased awareness of lead poisoning, we also expect to begin selling into OB/GYN offices.

142. Defendant Kraeutler abandoned this unbridled optimism just three weeks later when, on November 10, 2016, Meridian issued a press release confirming the final financial results for the fourth quarter and full fiscal year ended September 30, 2015, as filed as an exhibit for the Form 8-K filed by the Company with the SEC the same day and signed by Defendant Lueke as Executive Vice President and CFO. With respect to the Company's 2017 guidance, in that press release, Individual Defendant Kraeutler is quoted as stating:

> Our guidance for fiscal 2017 is now published. ***We believe these projections are reasonable, and will prove to be realistic, with quarter-to-quarter results supporting our expectations***. Our core diagnostics unit will continue to focus on providing a total solution to diagnostic challenges, largely led by our simple and rapid illumigene® molecular platform. . . ***Finally, Magellan Diagnostics, acquired in March 2016, has exceeded our expectations in satisfying the demand for testing children for elevated blood lead levels***. The focus on this topic is expected to continue as the impact of elevated levels continues to be recognized as an important cause of developmental issues in young children. Recently, we have introduced the Magellan products to the global markets with a very positive response. ***This business unit is expected to report low-double-digit organic growth in fiscal 2017 with the potential for upside performance***.

143. Defendants also reaffirmed Meridian's previously announced guidance of $205 million to $210 million and per share diluted earnings between $0.81 and $0.85.

144. Yet, as would only come to light after the FDA's public reveal, Defendants had no reasonable basis for their belief that Magellan would meet its quarter-to-quarter projections because the entire business-line was built on a faulty product that was incapable of "satisfying the demand for testing children for elevated blood lead levels" because of its failure to provide accurate readings to spur on more appropriate care. As a result, Defendants had received numerous patient complaints regarding the faulty LeadCare family of products.

145. Additionally, any "increased awareness of lead poisoning" would actually work against the Company in 2017 as the public rose in protest against a Company that was actively manipulating its public and FDA statements to the detriment of children.

146. Defendants' newfound tempered approach to discussing Magellan was rooted in that which they knew, that the investing public did not – the Company had overseen several corporate actions that evidenced the failures of the LeadCare products including, but not limited to: (i) sending the November 2016 notice to customers of the Company's LeadCare II system instructing them to implement a four hour incubation period (a period which was not properly validated by Magellan); (ii) the opening of ECO 7060 to revise LeadCare II's labeling to include incubation on November 17, 2016; (iii) Magellan's intake of Customer Complaint Case # 00132411 on January 13, 2017 related to five separate events of underestimation of blood lead levels with five different patients; and (iv) the March 21, 2017 closing of CAR 108 for that very issue despite any lack of verification that the four hour incubation period was effective.

### C. Materially False and Misleading Statements About Internal Controls

147. Throughout the Class Period, the Defendants falsely misrepresented the quality of Meridian's internal controls, claiming to regularly evaluate Meridian's controls and procedures and finding no deficiency or weakness, employing identical language throughout the Class Period (with the exception of the effective date):

> As of [effective date], an evaluation was completed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(b) and 15d-15(b) promulgated under the Securities Exchange Act of 1934, as amended. Based on that evaluation, our management, including the CEO and CFO, concluded that our disclosure controls and procedures were effective as of [effective date]. There have been no changes in our internal control over financial reporting identified in connection with the evaluation of internal control that occurred during the [ ] fiscal

> quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, or in other factors that could materially affect internal control subsequent to [effective date]. We routinely refine our internal controls over financial reporting in the normal course of business as new business activities arise or risks change. These refinements are made under a program of continuous improvement.

148. This identical language appeared in the May 2016 10-Q (with an effective date as of March 31, 2016) and the August 2016 10-Q (with an effective date as of June 30, 2016).

149. Notably with respect to the August 2016 10-Q, Meridian owned Magellan for the entirety of the quarter (which spanned April 1, 2016 to June 30, 2016), having closed the acquisition of that company on March 24, 2016. However, Meridian did not disclaim any review of Magellan's internal controls in its ultimate finding that "there have been no changes in [Meridian's] internal control over financial reporting identified in connection with the evaluation of internal control that occurred during the third fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting, or in other factors that could materially affect internal control subsequent to June 30, 2016." Instead, the Company would only choose to employ that language later.

150. In the 2016 Form 10-K, notably filed on November 29, 2016 (after the initial disclosure identified by Lead Plaintiff herein, but prior to the full truth's reveal to the market), the Individual Defendants provided a report on internal controls over financial reporting, falsely misrepresenting that the Company's internal controls were effective as of September 30, 2016 while explicitly excluding any review of the internal controls of Magellan:

> <u>Management's Report on Internal Control over Financial Reporting</u>
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f).
>
> The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the

Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting can only provide reasonable assurance and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including the Chief Executive Officer and the Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of September 30, 2016, based on the framework and criteria in the 2013 *Internal Control – Integrated Framework*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on management's evaluation and those criteria, the Company concluded that its system of internal control over financial reporting was effective as of September 30, 2016. ***The Company's assessment of and conclusion on the effectiveness of its internal control over financial reporting did not include the internal controls of Magellan Biosciences, Inc., which was acquired during fiscal 2016 and the results of which since the date of acquisition were included in the 2016 consolidated financial statements. Magellan constituted $78,977 or 31.4% of the Company's total assets as of September 30, 2016, and $10,034 or 5.1% of total net revenues, for the year end September 30, 2016.***

The Company's independent registered public accounting firm has issued an attestation report on the registrant's internal control over financial reporting.

/s/ John A. Kraeutler
John A. Kraeutler
Chief Executive Officer
November 29, 2016

/s/ Melissa A. Lueke
Melissa A. Lueke
Executive Vice President and
Chief Financial Officer
November 29, 2016

151. In February 2017, the Company amended its internal controls disclosure in the February 2017 10-Q (with an effective as of date of December 31, 2016), using the same language employed in the May 2016 10-Q and August 2016 10-Q, but specifically carving out any assessment of the internal controls of Magellan:

> ***The Company's assessment of and conclusion on the effectiveness of its internal control over financial reporting did not, and is not required to include the internal controls of Magellan Biosciences, Inc., which was acquired during fiscal 2016 and the results of which have been included in the Company's consolidated financial statements since the date of acquisition.***

152. The Company would revert to the disclaimer-less language used in the May 2016 10-Q and August 2016 10-Q for: (i) the May 2017 10-Q (with an effective as of date of March 31, 2017); and the August 2017 10-Q (with an effective as of date of June 30, 2017).

153. Each of these Class Period SEC filing were accompanied by certifications pursuant to Securities Exchange Act Rule 13a-14(a) executed by both Defendants Kraeutler and Lueke. These statements attested to the signatory's review of the SEC filing in question and stated:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles;

> c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

154. Further, each of the Class Period SEC filings were accompanied by a Certification of Chief Executive Officer and Chief Financial officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2009 (a "SOX" Certification"). The identical SOX certifications were jointly executed by Individual Defendants Kraeutler and Lueke and stated:

> In connection with the filing with the Securities and Exchange Commission of the Quarterly Report of Meridian Bioscience, Inc. (the "Company") on Form 10-Q for the period ended [effective date] (the "Report"), the undersigned officers of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of their knowledge:
>
> 1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

155. Yet, as would be admitted by the Company in its annual report for the 2017 fiscal year, as filed with the SEC on Form 10-K on November 29, 2017 (the "2017 Form 10-K"), the Company's internal controls contained a "material weakness . . . that, if not properly corrected, could materially adversely affect [its] operations and result in material misstatements in [the Company's] financial statements," rendering each of the statements identified in this section false and misleading.

156. As stated in the 2017 Form 10-K:

> During the course of completing this evaluation we identified deficiencies related to Information Technology General Controls ("ITGC") intended to restrict access to certain data and applications, resulting in inappropriate access at both the Information Technology and end user levels within an application impacting financial reporting functions and controls.

157. In actuality, this terse disclosure was simply a confirmation of what the market already knew and what the FDA had previously revealed – that when Meridian acquired Magellan it acquired a company with vastly insufficient internal disclosure controls and the Individual Defendants either knowingly or recklessly chose to disregard the internal control problems to further their own self-interest.

## VI. THE TRUTH IS REVEALED OVER THE COURSE OF SEVERAL PARTIAL DISCLOSURES

### A. The Truth is Partially Revealed when the Company Announces a Decrease in its Guidance and Dividend

158. On January 25, 2017, just two and a half months after the Company issued its guidance, Meridian issued a press release reporting its financial results for the first quarter of 2017, announcing that the Company was both reducing its regular cash dividend and revising its fiscal 2017 guidance downward.

159. Despite touting Magellan's quarterly performance and a reported quarter-over-quarter 32% revenue growth (performance that would later be exposed as the result of a large one-off international order and not any larger market share capture or breakthrough), the Company revised its Fiscal 2017 Guidance downward:

> Based on current business trends for the fiscal year ending September 30, 2017, management now expects net revenues to be in the range of $193 million to $199 million and per share diluted earnings to be between $0.64 and $0.69. Prior guidance was for revenues in the range of $205 million to $210 million and per share diluted earnings of $0.81 to $0.85. The per share estimates assume an increase in average diluted shares outstanding from approximately 42.4 million at fiscal 2016 year end to approximately 42.6 million at fiscal 2017 year end. The revenue and earnings guidance provided in this press release is derived from expected internal growth and does not include the impact of any acquisitions the Company might complete during fiscal 2017.

160. The real reason for the guidance adjustment, however, was that several actions taken after the November 2016 guidance pointed to the writing on the wall for the Individual Defendants with respect to the LeadCare products and the FDA.

161. For example, on November 4, 2016, Magellan sent its "Notice to Customers" instructing them to implement a four hour incubation period before testing venous blood samples in its LeadCare II system.

162. Magellan similarly issued a product bulletin on November 11, 2016, titled "Effect of Rubber Cap Interference on the LeadCare II System." Therein, it identified the Becton Dickinson rubber stopper as causing the lead level underestimation and instructed a four hour incubation period.

163. This was followed by the November 17, 2016 opening of ECO #7060 to revise the LeadCare II labeling instructions to include the four hour incubation period – with Magellan itself acknowledging on the Eco that this incubation period change was one that "affects the design, production or assessment of product form, fit, or function."

164. Additionally, according to the coverage of the MDR filed by Magellan with the FDA on May 8, 2017, Magellan had tried to submit an MDR related to the underestimation issues in the LeadCare II product in November 2016. However, the company originally attempted to submit the report in paper form and it was subsequently retuned by the FDA with the instruction to be submitted electronically. Despite registering with the FDA for an electronic submission account in February 2016, Magellan never followed suit and timely followed this MDR – waiting until May 8, 2017 to do so, on the eve of the FDA's site inspection.

165. Further, the Company would no longer have the benefit of excluding Magellan's internal controls from its analysis – an event that would ultimately lead to the disclosure of a material weakness in the 2017 Form 10-K.

166. When viewed holistically, the presence of these Magellan actions after the initial guidance, but prior to the Company's downward adjustment, present a cogent and compelling explanation for Meridian's actions, particularly as the guidance was "derived from expected internal growth."

167. This conclusion is further bolstered by the fact that there was no additional downward guidance adjustment in July 2017 when the Company announced the goodwill impairment charge and acknowledged the FDA's inspection and recall of the LeadCare products, with the Company affirming its $193 million to $199 million net revenue guidance, excluding the effect of the goodwill impairment charge.

168. The news would send the Company's stock price plummeting, from a closing price of $16.45 on January 24, 2017 to $12.80 on January 25, 2017 – a loss of more than 22%.

169. Unsurprisingly, the Company would announced on November 9, 2017 that it was reporting full year fiscal net revenues of $200.8 million, thus, exceeding the lowered guidance, but falling short of the year's original guidance.

170. Yet, because of the Company's efforts to misrepresent its regulatory relationship with the FDA and its financial prospects (the same criticisms given by the United States senators in their letter to the FDA and CDC), the market knew only of the financial impact to this point without the true facts underlying the cause. That would come by way of the FDA.

### B. THE FDA'S MAY 17, 2017 ANNOUNCEMENT REVEALS FOR THE FIRST TIME THAT CERTAIN OF MERIDIAN'S LEADCARE PRODUCTS WERE PRODUCING INACCURATE RESULTS

171. On May 17, 2017, after just four days on site, the FDA had presumably seen enough and issued, along with the CDC, a joint press release warning of Magellan's LeadCare products' inaccurate results and recommending retesting of certain children, pregnant women and nursing mothers, noting Defendants had concealed the issue for years, dating back to 2014:

> **FDA warns Americans about risk of inaccurate results from certain lead tests**
> **CDC recommends retesting for certain children, pregnant women and nursing mothers**
>
> The U.S. Food and Drug Administration and Centers for Disease Control and Prevention are warning Americans that certain lead tests manufactured by Magellan Diagnostics may provide inaccurate results for some children and adults in the United States. The CDC recommends that parents of children younger than six years (72 months) of age, and currently pregnant women and nursing mothers who have been tested for lead exposure consult a health care professional about whether they should be retested.
>
> "The FDA is deeply concerned by this situation and is warning laboratories and health care professionals that they should not use any Magellan Diagnostics' lead tests with blood drawn from a vein," said Jeffrey Shuren, M.D., director of the FDA's Center for Devices and Radiological Health. "The agency is aggressively investigating this complicated issue to determine the cause of the inaccurate results and working with the CDC and other public health partners to address the problem as quickly as possible."

The FDA's warning is based on currently available data that indicate Magellan lead tests, when performed on blood drawn from a vein, may provide results that are lower than the actual level of lead in the blood. Currently, the FDA believes the issue may date back to 2014. The warning includes all four of Magellan Diagnostics' lead testing systems: LeadCare; LeadCare II; LeadCare Plus; and LeadCare Ultra. At this time, all LeadCare systems can be used with blood from a finger or heel stick, including the LeadCare II system - a system found in many doctors' offices and clinics. In addition, some laboratories offer other methods of lead testing, which are not believed to be affected at this time.

The CDC is recommending that health care professionals retest children younger than six years (72 months) of age at the time of this alert (May 17, 2017) if their test was conducted using blood drawn from a vein using any Magellan Diagnostics' LeadCare System tests and received a result of less than 10 micrograms per deciliter (µg/dL). The CDC also recommends that women, who are currently pregnant or nursing and were tested in this manner while pregnant or nursing, get retested. Other adults who are concerned about their risk or the risk to an older child should speak to their health care professional about whether they should be retested.

"We understand that parents of children and others affected by this problem will be concerned about what this means for their health," said Patrick Breysse, Ph.D., director of the CDC's National Center for Environmental Health. "While most children likely received an accurate test result, it is important to identify those whose exposure was missed, or underestimated, so that they can receive proper care. For this reason, because every child's health is important, the CDC recommends that those at greatest risk be retested."

Lead exposure can affect nearly every system in the body, produces no obvious symptoms, and frequently goes unrecognized, potentially leading to serious health issues. Lead poisoning is particularly dangerous to infants and young children. While recommendations for lead screening differ from state to state, all states require children to be screened for lead exposure. Some adults are also at risk for lead exposure, including those who work around products or materials that contain lead.

The FDA, an agency within the U.S. Department of Health and Human Services, promotes and protects the public health by, among other things, assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the safety and security of our nation's food supply, cosmetics, dietary supplements, products that give off electronic radiation, and for regulating tobacco products.

CDC works 24/7 protecting America's health, safety and security. Whether diseases start at home or abroad, are curable or preventable, chronic or acute, stem

> from human error or deliberate attack, CDC is committed to respond to America's most pressing health challenges.

172. The FDA also issued a Safety Communication on May 17, 2017 (the "May 17 Safety Communication") with an intended audience of:

- Laboratories that use Magellan's LeadCare Testing Systems as part of diagnostic applications.
- Laboratory personnel who interpret the results of Magellan's LeadCare Testing Systems.
- Health care professionals who perform lead tests using Magellan's LeadCare Testing Systems.
- Patients being tested for elevated blood lead levels (BLL) with Magellan's LeadCare Testing Systems, in particular children in high-risk environments with BLL in the 5 to14 micrograms per deciliter (µg/dl) range.

173. The May 17 Safety Communication identified previous steps taken by the Magellan (both prior to and after the acquisition by Meridian) to deflect any blame for the underestimation issues in its LeadCare products. In fact, as summarized by the FDA, its "review of the company's data supporting the issues contained in their customer notifications did not confirm a root cause (including the tubes) for the inaccurate results. In fact, the FDA found a lack of reliable data identifying the root cause of the problem, the frequency and extent of inaccurate test results for the LeadCare Testing Systems, and a lack of adequate effectiveness to support the mitigating steps taken by Magellan."

174. On this news, the Company's stock price dropped almost 9%, from a closing stock price of $14.75 per share on May 16, 2017 to a closing price of $13.45 on May 17, 2017.

175. The May 17th press release by the FDA and Safety Communication were accompanied by swift action by the FDA which, on May 18, 2017, posted a Class I Device recall for the LeadCare Ultra blood lead tests based on the underestimation issue, recommending the removal of venous blood samples as an allowable sample type for all LeadCare products. Importantly, the May 18, 2017 recall not only superseded the November 29, 2014 Notice to

Customers, but also an undisclosed May 1, 2017 revised letter to customers that recommended they make certain workflow changes, including the discontinuation of collecting blood samples for lead testing in certain BD vacutainer tubes and to discontinue the 24 hour incubation period.

176. Defendant Kraeutler ***admitted*** the Company's knowledge as to the problems identified by the FDA to that point when, on May 22, 2017 at the UBS Global Healthcare Conference he stated:

> [T]he news that came out of Magellan, one of our subsidies last week, was a little disconcerting. We had, in 2014, before we own [*sic*] Magellan, we'd advised the FDA that when testing for blood lead, blood collected in a Vacutainer tube could cause problems and we put a remedial step in there.
>
> If you look at lead testing across the United States, most of it is done by fingerstick or heelstick, none of that has been affected by this. But the FDA believes that the data that is supporting the remedial step on venous blood is insufficient. So we have agreed with them that we will continue to work together and we will begin to move those customers that were using tubed blood to fingerstick.

177. Notably, Defendant Kraeutler made no mention of the litany of other violations the FDA would soon make public with the release of its Form 483.

178. The recall was later expanded to all lots of all LeadCare products: I, II, Ultra and Plus, on June 6, 2017, with the FDA recommending the discontinuation of testing of all venous blood samples on any LeadCare product. According to the recall notices, there were more than 178,000 blood testing kits in commerce at the time of the June 6th recall.

179. The full picture, however, remained muddied as the Company actively sought to obfuscate information surrounding the LeadCare deficiencies in favor of continued false statements.

### C. The FDA's Site Inspection Report Confirms Prior LeadCare Product Issues and A Company That Knew About the Lead Underestimation Issues, Yet Actively Concealed Complaints and Labeling Changes From the FDA

180. On June 29, 2017, the FDA issued its Form 483 site inspection report to Meridian-owned Magellan, which was not publicly disclosed to investors until July 13, 2017 (the "Form 483"). The FDA's findings were scathing.

181. Following fifteen days of inspections between May 10, 2017 and June 29, 2017, the FDA submitted numerous observations to the Company that Defendants: (1) did not ensure the design validation for devices conformed to defined user needs and intended uses; (2) used an inadequate risk analysis with respect to falsely low lead results across the LeadCare product line; (3) did not maintain adequate procedures for receiving, reviewing and evaluating customer complaints which led to customer complaints going improperly addressed or not addressed at all; (4) failed to implement proper investigation or the institution of a Medical Device Report per FDA requirements; (5) failed to maintain procedures for corrective and preventative action with respect to inbound complaints, including several that were left indefinitely open or closed without verifying any corrective instruction remediated the issue; (6) failed to inform the FDA of several of its notices to customers that included incubation instructions to correct lead level underestimation; (7) failed to adequately establish procedures for design change, including their failure to report changes to labeling to include incubation periods; (8) expanded original acceptance criteria to fit results observed in validation studies rather than establishing these criteria prior to the study; (9) failed to report multiple MDRs upon learning of a marketed device malfunction that was likely to cause death or contribute to a death or serious injury if the malfunction were to recur related to the LeadCare Ultra system's underestimation of lead levels; and (10) failed to establish a control product that conformed to specific requirements.

182. The release of the Form 483 coincided with the public FDA statement from Alberto Guitierrez, Ph.D., Director, Office of In Vitro Diagnostics and Radiological Health, FDA's Center for Device and Radiological Health on the status of the FDA's investigation into inaccurate results from certain lead tests. Therein, Dr. Guitierrez indicated that the FDA was "carefully reviewing the evidence collected during the inspection to determine if there have been violations of federal law and whether further action is warranted."

183. The Form 483 exposed Defendants as either purposely or recklessly seeking to obscure any regulatory insight into their LeadCare issues by failing to follow Meridian's own operating procedures or even follow up with customer complaints.

184. For example, FDA Observation 3 found that Defendants failed to adequately establish or maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit, but allowing, *inter alia*, for the misidentification of inbound customer complaints as "Support Request/ Help Desk" communications that subsequently followed the "non-Complaint Customer Interaction Procedure." This was specifically the issue with Customer Complaint Case #s 00110311, 00114483, 00117184, 00120173, and 00126813, each of which involved a "false negative" lead patient results, but which were not treated as actual complaints and were not evaluated for MDR reportability or whether they needed further investigation.

185. Further, Defendants turned a blind eye to whether the purported incubation period actually worked, as found in FDA Observation 4, by choosing to close CAR 108 on March 21, 2017 (more than a year after the Merger) on the basis of the effectiveness of the four hour incubation period, but then never investigating Customer Complaint # 00132411 - which was communicated to Magellan on January 13, 2017 (after the two separate "Notice to Customer" communications were sent by Magellan, but prior to CAR 108's closing) and after Company

employees confirmed that the clinician used the appropriate incubation period and still had falsely low readings. By regulation, CAR 108's closing and any corrective actions taken thereunder would have necessarily been presented to Magellan management, including Amy Winslow pursuant to 21 C.F.R. § 820.100(a)(7).

186. Defendants' failure to investigate can be explained by their desire to avoid reporting an MDR at all costs, as such an action ran the risk of halting the entirety of Magellan's business as it was solely reliant on its LeadCare products and blood lead testing technology.

187. For example, and as identified by the FDA in its Observation 8, Defendants failed to submit any MDR for at least one Class Period complaint – receiving Customer Complaint # 00132441 on January 13, 2017 involving five events of underestimation of blood lead results from the LeadCare Ultra system in five different patients ***even after implementing the recommended 24 hour incubation period***. Employees of the Company even went as far as to include a February 13, 2017 comment in the file for this complaint that the customer's complaint was confirmed, yet Defendants failed to make the FDA aware of the issue (particularly in light of the fact that it occurred after the Company's notice to customers which purportedly disseminated a "fix" to the issue), in direct violation of section 519 of the FFDCA, 21 U.S.C. §360i and 21 C.F.R. § 803.50(a)(2). Defendants' late reporting, or non-reporting, was a common occurrence, as the Company routinely submitted MDRs ***hundreds of days late***, if at all.

188. Yet even in the face of these violations and regulatory findings, the Company continued to perpetuate certain of the same false statements identified herein. Indeed, Meridian continued to materially misrepresent Magellan's industry position and regulatory status in SEC filings after the FDA's May 2017 announcement, claiming in the quarterly report filed on Form 10-Q with the SEC on August 9, 2017 (the "August 2017 10-Q"):

> Headquartered near Boston, Massachusetts, Magellan is a leading manufacturer of ***FDA-cleared products*** for the testing of blood to diagnose lead poisoning in children and adults. Magellan is the leading provider of ***point-of-care*** lead testing systems in the U.S.

189. Further, Defendants sought to distance themselves from the FDA's investigation and LeadCare issues by spinning the story as one that occurred prior to Meridian's acquisition of Magellan. For example, the press release issued by the Company on July 27, 2017 and attached to the Current Report on Form 8-K filed with the SEC on that same day and signed by Defendant Lueke as Executive Vice President and CFO of Meridian stated, "[t]he matters connected with the FDA Safety Notification ***occurred at Magellan prior to Meridian's acquisition*** of the company."

190. This identical statement appeared in the quarterly report filed on Form 10-Q with the SEC on August 9, 2017 (the "August 2017 10-Q"). The August 2017 10-Q was signed by Defendant Lueke as Executive Vice President and CFO of Meridian.

191. In attempting to perpetuate the myth that the LeadCare problem was solely connected to the pre-Merger Magellan, the July 27, 2017 press release stated: "With regard to the recent FDA issues within Magellan Diagnostics ***which occurred prior to our acquisition in March 2016***, we are committed to remediating both specifically noted quality weaknesses, as well as undertaking a complete upgrade of their quality system."

192. Each of these statements was demonstrably false at the time they were made, and Defendants knew them to be so because of their extensive due diligence and oversight of Magellan while undertaking certain Class Period corrective actions and were in receipt of multiple customer complaints that showed those actions ineffectual.

193. As of late June 2017 Defendants had in their possession the Form 483 from the FDA which highlighted the regulator's observations and which specifically identified ongoing regulatory violations, unaddressed issues across all LeadCare products, and specific post-Merger

actions taken by Meridian-owned Magellan that not only sought to obscure the pervasiveness of the LeadCare issue, but that actively sought to end-run around FDA regulations. Further, in response to the FDA's Form 483, in September 2017 the Company submitted a response which included proposed actions to address and correct the observations found in its site visit – proposals that were ultimately deemed inadequate by the FDA. The temporal proximity of these actions, including the ***ongoing violations,*** to the statements identified above evidence that Defendants were seeking to misrepresent their role in the LeadCare issues – a misrepresentation that would soon unravel.

### D. THE TRUTH IS FULLY REVEALED WHEN THE FDA ISSUES ITS WARNING LETTER ON OCTOBER 23, 2017, DETAILING THE FULL EXTENT OF DEFENDANTS' VIOLATIONS OF FDA REGULATIONS, THE PROBLEMS WITH THE LEADCARE PRODUCTS AND THE EXTENT OF DEFENDANTS' DECEIT ON THE FDA

194. On October 23, 2017, the FDA issued a warning letter (the "October 23 FDA Warning Letter"), which specifically found, *inter alia*, that Magellan's LeadCare II and LeadCare Ultra systems were adulterated under the FFDCA, as well as misbranded based on the unapproved labeling changes made by Magellan.

195. The October 23 FDA Warning Letter also addressed the response received from Meridian Executive Vice President, Magellan Diagnostics CEO Amy M. Winslow on July 21, 2017 concerning the observations from the Form 483, as well as a second response from Meridian on September 21, 2017, which the FDA found wholly in inadequate:[11]

> Our inspection revealed that your firm's LeadCare II and LeadCare Ultra Systems are adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), **(b)(4)**.

[11] References to "**(b)(4)**" in the FDA Warning Letter are to redactions made by the FDA pursuant to 5 U.S.C. § 552(b)(4), exemption 4 of the Freedom of Information Act, which protects from disclosure of "trade secrets or commercial or financial information obtained from a person and privileged or confidential."

The LeadCare II and LeadCare Ultra Systems are also misbranded under section 502(o) the Act, 21 U.S.C. § 352(o), because your firm did not notify the agency of its intent to introduce these devices into commercial distribution, in that a notice or other information respecting the modifications to each of these devices was not provided to FDA, as required by section 510(k) of the Act, 21 U.S.C. § 360(k), and 21 CFR 807.81(a)(3). Specifically,

1. Your firm made significant labeling and design changes to the LeadCare II System after FDA's clearance of that device on October 6, 2005. For example, the proposed labeling submitted to FDA as part of the premarket notification (510(k)) for the LeadCare II System at the time of the device's clearance describes the readiness of the sample for analysis immediately after mixing of the treatment reagent with the blood sample. However, your firm made a significant change by adding to the device labeling an instruction that users allow the blood-treatment reagent mixture to stand for 4 hours at room temperature prior to analysis for venous blood samples that are shipped or rocked. Your firm added this 4-hour incubation time to reduce the risk of the LeadCare II System underestimating lead values for these venous blood samples. This change could significantly affect the safety or effectiveness of the device and requires submission of a new 510(k). Your firm did not notify FDA of this significant change before introducing the modified LeadCare II System into commercial distribution, and FDA has not received a new 510(k) for the device to date.

2. Your firm made significant labeling and design changes to the LeadCare Ultra System after FDA's clearance of that device on August 20, 2013. For example, the proposed labeling submitted to FDA as part of the 510(k) for the LeadCare Ultra System at the time of the device's clearance describes the readiness of the sample for analysis immediately after mixing of the treatment reagent with the blood sample. However, your firm made a significant change by adding to the device labeling an instruction that users implement a minimum 24-hour incubation time for the blood-treatment reagent mixture prior to analysis. Your firm made this change to reduce the risk of the LeadCare Ultra System underestimating the lead values of some blood samples. This change could significantly affect the safety or effectiveness of the device and requires submission of a new 510(k). Your firm did not notify FDA of these significant changes before introducing the modified LeadCare Ultra System into commercial distribution.

**(b)(4)**

For a device requiring premarket approval, the notification required by section 510(k) is deemed satisfied when a PMA is pending before the agency. 21 CFR § 807.81(b). The kind of information that your firm needs to submit in order to obtain approval or clearance for a device is described on the Internet at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/default.htm. The FDA will evaluate the information that your firm submits and decide whether the product may be legally marketed.

We also note that, during the time your 510(k) for the LeadCare Plus System was pending, your firm added to the proposed labeling an instruction that users implement a minimum 24-hour incubation time for the blood-treatment reagent mixture prior to analysis. While your firm submitted proposed labeling to FDA that reflected this change, your firm described revisions made to the proposed labeling as "minor updates" and did not update your 510(k) submission to explain the significance of this change. For example, your firm should have identified this significant design change as a difference in the technological characteristics of the predicate device and the LeadCare Plus device that was under review in your 510(k) submission.

This inspection also revealed that your firm's LeadCare Systems are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at 21 CFR Part 820.

We received a response dated July 21, 2017 from Ms. Amy M. Winslow, President & CEO of Magellan Diagnostics, Inc., concerning the investigator's observations noted on the Form FDA 483 (FDA 483), List of Inspectional Observations, that was issued to the firm at the conclusion of the inspection. We acknowledge that the response states that **(b)(4)**, that your firm's current QA/RA management will be **(b)(4)**, and that **(b)(4)** will provide a comprehensive quality system training to your firm's personnel. We received an additional response from your firm dated September 21, 2017, and will evaluate this response along with any other written material provided in response to the violations cited in this letter.

We further address your firm's July 21, 2017 response below, as applicable, in relation to each of the noted violations. These violations include, but are not limited to, the following:

1. Design validation failed to ensure that devices conform to defined user needs and intended uses, as required by 21 CFR 820.30(g). For example:

a. At the time of clearance, the labeling of the LeadCare II and LeadCare Ultra Systems allowed for the immediate analysis of whole blood samples after thoroughly mixing the blood/treatment reagent mixture and after storage of that mixture for up to 48 hours at room temperature or up to 7 days if stored refrigerated. The labeling of the LeadCare Plus System, at the time of clearance, allowed for the analysis of venous whole blood samples after storage of the blood/treatment reagent mixture for 24-48 hours at room temperature and up to 3 days if stored refrigerated. However, your firm did not provide any documents showing that your original validation studies tested under these actual use conditions and that these studies support the blood/treatment reagent mixture stability claims made in your labeling.

b. Your firm released the LeadCare Ultra System for commercial distribution in September 2013 after becoming aware of the potential for falsely low and falsely

high test results for samples incubated less than 24 hours in the treatment reagent. For example, your firm's stability study for the treatment reagent provided during the inspection, entitled Blood in Treatment Reagent Stability Study Protocol-VP #113, Part 1, dated 09/05/2013, concluded that there was a "reproducible trend of increased [lead] signal with increased Sample/Treatment Reagent incubation time" as well as the possibility for "false lows or false highs"; and your firm's stability study for the treatment reagent, entitled Blood and Treatment Reagent Stability Study-VP #113, Part 2, dated 09/10/2013, stated that "Sample/Treatment Reagent Preparations **(b)(4)**."

c. Your firm released the LeadCare Ultra System for commercial distribution after some results obtained in your firm's stability study failed to meet the original acceptance criteria documented in Magellan Diagnostics Design Control Document entitled, "Blood and Treatment Reagent Stability Study-VP # 113, Part 2, Rev 1", dated 9/10/13, which were **(b)(4)**. The final report for that study recommends expanding the acceptance criteria in the study protocol and to pass data **(b)(4).**

d. On November 24, 2014, your firm sent a Notice to Customers letter instructing customers to incubate the blood-treatment reagent mixture for at least 24 hours to prevent underestimation of the lead concentration of blood samples on the LeadCare Ultra System. On November 4, 2016, your firm sent a Notice to Customers letter instructing customers to incubate venous blood/treatment reagent mixtures for samples that may have come in contact with the rubber stopper of a blood collection tube for at least 4 hours to prevent underestimation of the lead concentration of blood samples on the LeadCare II System. Your firm failed to validate the effectiveness of these minimum incubation times for LeadCare Ultra (24 hours) and for LeadCare II (4 hours). These minimum incubation times also do not allow for the immediate analysis needs of some healthcare providers for their patients, as reported in Complaint Cases #00112233, dated 10/28/2014, and #00119771, dated 09/09/2015.

We have reviewed your firm's response and conclude that it is not adequate. Your response states that you have initiated Corrective Action Plans CAR-1223 and CAR-1229 and that you have conducted studies to verify that the 24-hour incubation of the blood/treatment reagent mixture was an effective mitigation to prevent the underestimation of the lead concentration in certain blood samples. Your response acknowledges, however, that the studies were not well documented. Your response further states that in order to re-establish venous blood as an acceptable sample type, your firm is working to complete and document further validations and that your firm will assess its existing design validation studies to determine if there are failures to ensure that devices conform to defined user needs and intended uses other than those identified in the FDA 483. Additionally, your response states that **(b)(4)** by the end of the 2017 calendar year. Your response also states that **(b)(4)** will provide training to your employees, including training on validation protocols, by January 2018. However, you have not provided supporting documentation for your firm's corrective actions, including documentation to support that you have performed adequate validations.

2. Failure to ensure that design validation includes risk analysis that is complete and adequate, pursuant to 21 CFR 820.30(g). Specifically, your Risk Analysis Procedure, SOP 159, Rev 04, requires product risk analysis to be updated based on post-production information. However, your firm failed to update, identify, and/or adequately evaluate the risks to patients from falsely low results for the LeadCare Ultra, LeadCare II, and LeadCare Plus Systems. For example:

a. The LeadCare Ultra Risk Analysis, entitled Risk Analysis-Lead Care, Rev 10, dated 05/31/2013, did not list false negative or false low results as a potential hazard or risk. Further, this risk analysis was not updated based on your firm's studies entitled "Blood in Treatment Reagent Stability Study Protocol-VP #113, Part 1", dated 09/05/2013, which concluded that there was a reproducible trend of increased lead signal with increased sample/treatment reagent incubation time which can create false low or false high results; and "Blood and Treatment Reagent Stability Study-VP #113, Part 2", dated 09/10/2013, which also found an increased lead signal with increased incubation time. In addition, this LeadCare Ultra Risk Analysis was not updated after your firm became aware in August 2014 of customer complaints of discrepancies in results obtained from the LeadCare Ultra System.

b. The LeadCare II Risk Analysis, entitled Risk Analysis-Lead Care II, Rev 6, dated 09/08/2005, included a hazard of "Erroneous Result, False Low." However, the analysis of this hazard was not updated based on customer complaints regarding falsely low results to reflect the likelihood of harm with respect to venous blood samples.

c. The Risk Management Plan, LeadCare Plus Blood Lead Testing System, Rev 5, dated 09/18/2014, identified the hazard of "**(b)(4)**", with a severity classification of **(b)(4)** (defined as "[f]ailures or **(b)(4)** that **(b)(4)**") and a probability of **(b)(4)** (defined as "**(b)(4)**"). This hazard was not updated based on post-production information.

We reviewed your firm's response and conclude that it is not adequate. Your response states that you have initiated Corrective Action CAR-1224 and that your firm will independently create a comprehensive Failure Mode and Effects Analysis (FMEA) template to be used for assessing risks for the LeadCare Systems family to ensure the risk analysis for each device includes all shared failure modes. In addition, your response states that your firm will reassess all elements of its risk assessment documents for the LeadCare Systems and revise them to eliminate any identified gaps. However, your response does not include updates to your Risk Analysis for the LeadCare Ultra, LeadCare II, and LeadCare Plus Systems, including updates in accordance with Risk Analysis Procedure, SOP 159, Rev 04, which requires that product risk analysis be updated based on post-production information. In addition, you have not provided supporting documentation for your firm's corrective actions.

3. Failure to establish procedures for receiving, reviewing, and evaluating complaints by a formally designated unit, pursuant to 21 CFR 820.198(a). Specifically,

a. Your firm has not adequately established procedures that define how your firm's Product Support employees uniformly evaluate information to determine if it represents a complaint or a non-complaint customer interaction. For example, your firm's Complaint Procedure, SOP #107, Rev 09 and 21 CFR 820.3(b) define a complaint as "any written, electronic, or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness or performance of a device after it is released for distribution." However, Support Request Case # 00103942 involved a customer describing particulate matter in the treatment reagent, and Support Request Case # 00122401 involved a customer describing variation in the results obtained on the LeadCare Plus and the results obtained using another analyzer. However, your firm identified these communications as "Support Request/Help desk" case types and did not provide documentation that your firm evaluated them as complaints or evaluated whether they represent events that must be reported to FDA as medical device reports (MDRs) under 21 CFR Part 803.

b. Complaint Cases #'s 00114483 and 00126813, are examples of complaints describing low results obtained using the LeadCare Ultra System or LeadCare II System in comparison to results obtained using another method. Customer Complaint Cases #s 00110311, 00117184, and 00120173 are examples of complaints describing discrepancies in test results obtained for the same sample using one of the LeadCare Systems. Your firm's Complaint Procedure, SOP #107, Rev 09, requires that any complaint pertaining to incorrect results must immediately be reviewed for MDR reporting. However, the "MDR Chart for Complaints" section of the case files for these 5 complaints is blank, and your firm provided no documentation showing how these complaints were evaluated according to your firm's Complaint Procedure to determine whether an MDR was required.

c. Your firm has not established procedures that define how cases originally categorized as customer support requests are uniformly entered by employees into your firm's electronic **(b)(4)** system and uniformly evaluated to ensure the information will be accurately processed into the **(b)(4)**, if the support request case is subsequently determined to constitute a complaint for which an investigation may be necessary. For example, during the inspection, your firm's Director of Quality Assurance and Regulatory Affairs explained that your firm had been unable to determine how to convert a customer support request into a customer complaint in the **(b)(4)** system.

d. Your firm did not follow your Customer Complaint Procedure, SOP #107, Rev. 9, with respect to the following three complaints, which remained open after **(b)(4)** days from receipt of the complaint, without documented justification:

Complaint Cases #'s 00124439 (open 122 days), 00127556 (open 109 days), and 00124108 (open 195 days).

We reviewed your firm's response and conclude that it is not adequate. Your response states that you have initiated Corrective Action Plan CAR-1225 and that your firm will be conducting a retrospective review of all complaints logged since July 2015, including those that are classified as Support Request/Help Desk case types, by October 2017. However, you have not provided documentation demonstrating that evaluations and/or investigations of all complaints noted in the above examples were completed. Further, your response states that your **(b)(4)**, the **(b)(4)**, and the **(b)(4)** document management system in order to determine when CAPA and complaint investigations are warranted. Please provide supporting documentation of the updates to this process as they are complete.

4. Failure to establish corrective and preventive action procedures, pursuant to 21 CFR 820.100(a). Specifically, your firm has not adequately implemented Corrective and Preventive Action Procedure, SOP 128, Rev 6, which requires effectiveness verification, defined as a "documented process to establish that the action accomplishes the intended objective and is proven to be effective", before CAR closure. For example, CAR 108 was opened to investigate the underestimation of lead concentration readings from the LeadCare Ultra System. As part of your corrective action, your firm issued a Notice to Customers, dated 11/24/2014, instructing them to incubate the blood-treatment reagent mixture for at least 24 hours. Your firm received customer complaints documented in Complaint Cases #00116937 (reported low LeadCare Ultra results by customer not using 24-hour incubation time) and #00132411 (reported low LeadCare Ultra results when using the 24-hour incubation time) after the customer notification, however, the CAR was closed on 03/21/2017 despite the lack of verification that the action was effective.

We reviewed your firm's response and conclude that it is not adequate. Your response states that you initiated Corrective Action Plan CAR-1226 and that, by calendar year, Q1 2018, your firm will conduct a retrospective review of all closed CAPAs generated from July 2015 to present to ensure each CAPA is effective and includes objective evidence verifying effectiveness. Your response also states that your firm will reassess how CAPAs are issued, as part of remediation actions. Further, your response states that following your **(b)(4)**, a detailed Comprehensive Priority Action Plan will identify target completion dates for activities and documents requiring remediation. However, you have not provided supporting documentation for your firm's corrective actions.

5. Failure to establish procedures for identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation, pursuant to 21 CFR 820.30(i). Specifically, your firm's Engineering Change Order Procedure SOP #123, Rev 01, was not followed and did not assure that appropriate validation/verification occurred for the design changes implemented by your firm to add a minimum incubation time to the test procedure

for the LeadCare II, LeadCare Ultra, and LeadCare Plus Systems and to add these changes to the labeling for those devices. For example:

a. LeadCare II

• Your firm opened Engineering Change Order (ECO) #7060, dated 11/17/2016, to revise the LeadCare II labeling to include a four-hour incubation time. However, your firm documented that the change did not require validation/verification of the product or process and did not indicate whether an update to Risk Management documentation was required, despite the change being classified by your firm as a **(b)(4)** change, which your ECO defines as "affects the design, production, or assessment of product form, fit, or function."

• In ECO #7060, Form 123-05, "Regulatory Decision", Rev 00, Page 2, your firm documented in the Decision Summary section that the change was classified as **(b)(4)**, which requires submission to FDA prior to implementation of the change and instructs to "Complete a 510(k) Notification and Technical File as required." However, your firm did not follow this instruction in the procedure and instead noted on Form 123-05 that "this is a MedWatch (MDR) filing."

b. LeadCare Ultra

• Your firm opened ECO #6968, dated 08/04/2015, to revise the LeadCare Ultra labeling to include, among other things, an instruction to allow mixture of patient blood samples and treatment reagent to stand for 24 hours prior to analysis. However, your firm documented that the change did not require validation/verification of the product or process and did not indicate whether an update to Risk Management was required, despite the change being classified as a **(b)(4)** change, which your ECO defines as "does significantly affect the form, fit, function, or regulatory status of the product" and that "may affect product performance." Further, ECO #6968 also references Validation Report 157, but your firm's management stated during the inspection that the referenced validation study was cancelled and that a different validation study was the correct validation study.

• In ECO #6968, Form 123-05, "Regulatory Decision", Rev 00, your firm identified the change as **(b)(4)** although it was as classified **(b)(4)** on Form 123-04, Engineering Change Order Classification of Changes. In addition, on Form 123-05 in ECO #6968, your firm answered "Yes" to Question 5 of Section III B – Labelling Changes and "Yes" to Question 3 of Section III D – Materials Change For IVD. Based on those answers, Form 123-05 instructs that the regulatory decision for the change is "**(b)(4)**," which states that the change requires submissions prior to implementation. However, **(b)(4)** is documented on the form instead of **(b)(4)**. **(b)(4)** requires only updated documentation/justification to be maintained rather than a new regulatory submission.

c. LeadCare Plus

• Your firm opened ECO #6944, dated 05/05/2015, to revise the LeadCare Plus labeling to include a 24-hour incubation time. However, your firm documented that the change did not require validation/verification of the product or process. Further, ECO #6944 also references Validation Report 157, but, as noted above, your firm's management stated during the inspection that this validation study was cancelled.

• In ECO #6944, Form 123-04, Classification of Changes", Rev 00, your firm classified the change as a **(b)(4)** change that "does not significantly affect the design, production, or assessment of form, fit, function, and regulatory status of the product." However, your firm's "Blood in Treatment Reagent Stability Study Part 1 – 090513 Report", regarding a study conducted to assess the signal obtained on certain blood sample/treatment reagent mixtures, stored at room temperature over time using LeadCare Ultra sensors, states that a "change of instruction to include incubation time would require resubmitting data to FDA."

We reviewed your firm's response and conclude that it is not adequate. We acknowledge that your firm provided updated ECOs 6944 and 6968 to include a reference to the report entitled "LeadCare Ultra/Plus Retrospective Summary Report for **(b)(4)** (Incubation Time)". Your response also states that you have initiated Corrective Action Plan, CAR-1223 and that the definitions related to the **(b)(4)** of changes identified in your ECO procedure, which relate to the potential impact of the change on design, production, or product form, fit or function, do not adequately identify changes that have the potential to affect a product's clearance, stability, or validation studies. Further, your response states that the Regulatory Decision checklist that supports ECOs does not adequately address all change elements that should be considered when determining the impact on existing 510(k)s and the need for premarket submissions. Your response also states that your firm will complete a **(b)(4)** and that comprehensive training, including training on change controls, will be provided by **(b)(4)**. Please keep our office updated on your ECO **(b)(4)** and provide supporting documentation for your firm's corrective actions.

6. Failure to establish procedures to control product that does not conform to specified requirements, pursuant to 21 CFR 820.90(a). For example, "Non-Conforming Material Procedure", SOP 113, Rev 2, defines "Use-As-Is" as **(b)(4)**." Your firm decided to "use-as-is" Controls with an initial average value assignment that would result in a range with a lower limit below the testing range for the LeadCare II after your firm changed the LeadCare II Lead Control Level 1 average value assignment for Lot # 1507N (Nonconforming Product Record NCP ID # 1175 opened 9/24/2015) and Lot # 1511N (Nonconforming Product Record NCP ID # 1193 opened 12/29/2015) without documenting that the Controls were verified to be acceptable for use. The lots identified in these nonconforming product records were later the subject of 71 Customer Complaints regarding customers unable to use their analyzers, due to the Controls being out-of-range.

We reviewed your firm's response and conclude that it is not adequate. Your response states that you have initiated Corrective Action Plan CAR-1231 and that

a **(b)(4)**, as well as the forms and processes used by your material review board to evaluate instances of non-conformity. Further, your response states that your **(b)(4)** to assess the impact of these uses on affected products. However, you have not provided any supporting documentation in your response demonstrating that you have retrospectively evaluated Lots #1507N and #1511N, and related complaints, which were included in the above example. You also have not provided supporting documentation for your firm's other corrective actions.

Our inspection also revealed that your firm's LeadCare Ultra System is misbranded under section 502(t)(2) of the Act, 21 U.S.C. § 352(t)(2), in that your firm failed or refused to furnish material or information respecting the device that is required by or under section 519 of the Act, 21 U.S.C. § 360i, and 21 CFR Part 803 - Medical Device Reporting. Significant violations include, but are not limited to, the following:

1. Failure to submit an MDR to FDA no later than 30 calendar days after the day that your firm received or otherwise became aware of information, from any source, that reasonably suggests that a device that it markets has malfunctioned and this device or a similar device that your firm markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur, as required by 21 CFR 803.50(a)(2). For example:

a. On January 12, 2017, your firm became aware of a customer complaint (Case # 00132411), in which a customer reported that the LeadCare Ultra System was providing low results in comparison to results obtained using another testing method. A February 13, 2017 comment in the file for Case #0132411 concludes that the customer's complaint is confirmed. FDA has not received an MDR for this event.

b. Your firm submitted MDR # 1218996-2015-00001, which FDA received on April 6, 2015. This MDR states that on August 13, 2014, your firm received complaints (Case #s 00110598 and 00110639, which indicated that two of your customers were getting higher results when repeating tests on the LeadCare Ultra System. In addition, MDR # 1218996-2015-00001 states that your firm received a complaint (Case # 00112168) on October 23, 2014, which indicated that another customer had observed differences between results obtained from the LeadCare Ultra System and those obtained from another blood lead analyzer. Your firm failed to submit an individual MDR within the required 30 calendar day timeframe for each MDR reportable event involving discrepancies in test results after testing using your firm's LeadCare Ultra System, of which your firm became aware through Complaint Case #s 00110639, 00110598, and 00112168.

We reviewed your firm's response dated July 21, 2017 and conclude that it is not adequate. Although your firm initiated a corrective action plan, CAR-1230, which is to include, among other things, a retrospective review to identify any past instances of MDR reportable events that were not reported to FDA, the Agency has not yet received individual MDRs for the MDR reportable events represented by

Complaint Case #s 00112168, 00110639 and 00132411. Additionally, your firm did not provide supporting documentation for the corrective actions described in your response.

2. Failure to adequately develop, maintain and implement written MDR procedures, as required by 21 CFR 803.17.

a. Your firm's procedure, "Adverse Event Procedure, SOP 108, Rev 4, dated 3/29/2016," does not establish internal systems that provide for timely transmission of complete medical device reports, as required by 21 CFR 803.17(a)(3). Specifically, the following are not addressed:

• The procedure does not include a process for submitting MDRs electronically in accordance with 21 CFR 803.12(a) and 21 CFR 803.20. Information about the Final Rule for electronic Medical Device Reporting (eMDR), published in the Federal Register on February 14, 2014, and the eMDR set-up process can be found on the FDA website at: http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/eMDR%E2%80%93ElectronicMedicalDeviceReporting/default.htm

• How your firm will submit all information reasonably known to it for each event. Specifically, which sections of the 3500A will need to be completed to include all information found in the firm's possession and any information that you can obtain by contacting a user facility, importer, or other initial reporter or by analysis, testing or other evaluation of the device.

b. In addition, the procedure does not describe how your firm will address documentation and record-keeping requirements, as required by 21 CFR 803.17(b), including requirements for systems that ensure access to information that facilitates timely follow-up and inspection by FDA.

Our inspection also revealed that your firm's LeadCare Ultra System and Lead Care II System are misbranded under section 502(t)(2) of the Act, 21 U.S.C. § 352(t)(2), in that your firm failed or refused to furnish material or information respecting those devices that is required by or under section 519 of the Act, 21 U.S.C. § 360i, and 21 CFR Part 806 – Medical Devices; Reports of Corrections and Removals. Significant violations include, but are not limited to, the following:

Your firm failed to submit to FDA a written report of a correction or removal of a device initiated to reduce a risk to health posed by the device or to remedy a violation of the Act caused by the device, which may present a risk to health, within 10 working days of initiating such correction or removal actions, as required by 21 CFR 806.10. For example:

a. On November 24, 2014, your firm sent a "Notice to Customers" letter instructing customers to incubate the blood-treatment reagent mixture for at least twenty-four hours to prevent underestimation of the lead concentration of blood samples for the

LeadCare Ultra System. Your firm did not submit a report of a correction or removal within 10 working days of initiating this action.

b. On November 04, 2016, your firm sent a "Notice to Customers" letter instructing customers to implement a four hour incubation of the blood-treatment reagent mixture for venous blood samples for the LeadCare II system in order to prevent potential underestimation of lead levels in those blood samples. Your firm did not submit a report of a correction or removal within 10 working days of initiating this action.

c. Your firm sent a "Revised Value Assignment-Temperature Correction" work sheet to customers that had previously complained about out-of-range LeadCare II Lead Controls, Level 1 & 2 on the following dates: March 11, 2016 (test kit lot numbers 1507N and 1508N); May 20, 2016 (test kit lot numbers 1510N); and June 26, 2016 (test kit lot numbers 1511M, 1511N, 1512N). Your firm did not submit a report of a correction or removal within 10 working days of initiating this action.

The adequacy of your firm's response cannot be determined at this time. We acknowledge that your firm has filed Reports of Corrections and Removals for the actions noted above. However, your response states that you will conduct a retrospective review of complaints, Service Request/Help desk reports, CAPAs, and investigations received, conducted or generated since July 2015 and will submit any related additional reports of corrections or removals required under 21 CFR part 806 by December 2017. Further, your response states that your firm will employ **(b)(4)** to provide comprehensive training on the Quality System regulation and related regulations, including on the requirements under 21 CFR part 7 and 21 CFR part 806, by August 2017. Please provide supporting documentation for your firm's corrective actions.

In addition, FDA recommends that your firm update its procedures to reflect the requirements under 21 CFR Part 806 Medical Devices; Reports of Corrections and Removals, and the guidance provided by the 21 CFR Part 7 Recall Policy, to ensure that all required information is provided to FDA or appropriately documented.

Your firm should take prompt action to correct the violations addressed in this letter. Failure to promptly correct these violations may result in regulatory action being initiated by the FDA without further notice. These actions include, but are not limited to, seizure, injunction, and civil money penalties. Also, federal agencies may be advised of the issuance of Warning Letters about devices so that they may take this information into account when considering the award of contracts. Additionally, premarket approval applications for Class III devices to which the Quality System regulation violations are reasonably related will not be approved until the violations have been corrected. Requests for Certificates to Foreign Governments will not be granted until the violations related to the subject devices have been corrected.

196. The October 23 FDA Warning Letter made several things clear, particularly that Meridian did not have an approved application for premarket approval in effect pursuant to section 515(a) of the FFDCA, 21 U.S.C. § 360e(a), and thus, the LeadCare II and LeadCare Ultra systems were adulterated under section 501(f)(1)(B) of the FFDCA.

197. Further, the unilateral labeling changes to include incubation periods, including Meridian's actions during the Class Period, effectively misbranded the LeadCare II and LeadCare Ultra systems under section 502(o) of the FFDCA, as Defendants failed to notify the FDA of their intent to introduce these devices into commercial distribution with the use modification (the required incubation period), as required by section 510(k) of the FFDCA.

198. All told, the October 23 FDA Warning Letter was clear: the LeadCare products were operating far outside of the realm of regulatory compliance.

199. This newest rebuke from the FDA further shocked the investing public, revealing for the first time that Amy Winslow, acting in her corporate capacity, proposed several changes to the FDA to address the observations from the Form 483 – proposals that the FDA found wholly inadequate. On this news, Meridian's stock price dropped from a closing price of $15.80 per share on October 20, 2017 to $15.20 per share on October 23, 2017, then to $14.50 per share on October 24, 2017 – a one day drop of approximately 4% and a two-day drop of more than 8%.

200. With no other choice, Meridian issued its own press release on October 23, 2017, stating that "[s]ince the issuance of the FDA 483 Inspectional Observations at the conclusion of the inspection, Magellan has initiated prompt and comprehensive quality system remediation activities. Magellan will promptly submit a response to the Warning Letter for the Agency's consideration."

## VII. DEFENDANTS' POST-CLASS PERIOD ADMISSIONS AND OTHER MATERIAL POST-CLASS PERIOD EVENTS

### A. DEFENDANTS ADMIT PRIOR CLASS PERIOD STATEMENTS REGARDING COMPLIANCE WITH FDA REGULATIONS WERE FALSE WHEN MADE

201. On November 29, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year September 30, 2017 (the "2017 Form 10-K"), signed by Defendants Lueke as Executive Vice President and Chief Financial Officer and Kraeutler as Executive Chairman of the Board. The 2017 Form 10-K effectively admits Defendants' prior statements regarding compliance with FDA regulations were materially false and misleading when made and corrected those prior false statements. Specifically, instead of describing Magellan as "a leading manufacturer of FDA-cleared products for the testing of blood to diagnose lead poisoning in children and adults" and "the leading provider of point-of-care lead testing systems in the U.S." (*supra*, ¶¶ 129-30), Defendants clarified that the FDA's clearance applied only to point-of-care testing of "capillary blood":

> Headquartered near Boston, Massachusetts, Magellan is a leading manufacturer of products cleared by the Food & Drug Administration ("FDA") for the ***point-of-care testing of capillary blood*** to diagnose lead poisoning in children and adults.

202. The inclusion of the "capillary" qualifier recognized that Magellan's point of care products did not function with blood drawn from the vein, a distinction the Company never made prior.

203. Further, the 2017 Form 10-K added new Risk Factors to address the possibility of the Company being unable to attain regulatory approval of future products and the possibility that it, or a third-party vendor, could fail to comply with FDA regulations relating to the manufacturing of its products or any components used therein (emphasis in original):

**Risks Affecting our Manufacturing Operations**

* * *

***If we or our third-party vendors fail to comply with FDA regulations relating to the manufacturing of our products or any component part, we may be subject to fines, injunctions and penalties, and our ability to commercially distribute and sell our products may be negatively impacted.***

Our diagnostics manufacturing facilities, and the manufacturing facilities of any of our third-party diagnostic component manufacturers or critical suppliers, are required to comply with the FDA's Quality System Regulation ("QSR") which sets forth minimum standards for the procedures, execution and documentation of the design, testing, production, control, quality assurance, labeling, packaging, sterilization, storage and shipping of the products we sell. The FDA may evaluate our compliance with the QSR, among other ways, through periodic announced or unannounced inspections which could disrupt our operations and interrupt our manufacturing. If in conducting an inspection of our manufacturing facilities, or the manufacturing facilities of any of our third-party component manufacturers or critical suppliers, an FDA investigator observes conditions or practices believed to violate the QSR, the investigator may document their observations on a Form FDA 483 that is issued at the conclusion of the inspection. A manufacturer that receives an FDA 483 may respond in writing and explain any corrective actions taken in response to the inspectional observations. The FDA will typically review the facility's written response and may re-inspect to determine the facility's compliance with the QSR and other applicable regulatory requirements. Failure to take adequate and timely corrective actions to remedy objectionable conditions listed on an FDA 483 could result in the FDA taking administrative or enforcement actions. Among these may be the FDA's issuance of a Warning Letter to a manufacturer, which informs it that the FDA considers the observed violations to be of "regulatory significance" that, if not corrected, could result in further enforcement action.

FDA enforcement actions, which include seizure, injunction and criminal prosecution, could result in total or partial suspension of a facility's production and/or distribution, product recalls, fines, suspension of the FDA's review of product applications, and/or the FDA's issuance of adverse publicity. Thus, an adverse inspection could force a shutdown of our manufacturing operations or a recall of our products. Adverse inspections could also delay FDA approval of our products and could have an adverse effect on our production, sales and profitability.

We and any of our third-party vendors may also encounter other problems during manufacturing including failure to follow specific protocols and procedures, equipment malfunction, and environmental factors, any of which could delay or impede our ability to meet demand. The manufacture of our product also subjects us to risks that could harm our business, including problems relating to our facilities and errors in manufacturing components that could negatively affect the efficacy

> or safety of our products or cause delays in shipment of our products. Any interruption or delay in the manufacture of the product or any of its components could impair our ability to meet the demand of our customers and cause them to cancel orders or switch to competitive products, which could, therefore, have a material adverse effect on our business, financial condition and results of operations.
>
> On June 29, 2017, the FDA, in connection with its recent Safety Notification related to Magellan's lead testing systems for venous blood samples, issued its Form FDA 483 to Magellan. This was followed by the FDA issuing a Warning Letter related to the matter on October 23, 2017. While we remain committed to strengthening Magellan's quality system and ensuring that all aspects of the system are in full compliance, we can provide no assurance that our remediation efforts will be successful to a degree acceptable by the FDA. See a more detailed discussion of this matter within MD&A on page 30.

204. The risk factors identified in prior annual reports and the quarterly reports that made reference thereto were silent as to the regulatory risk facing the Company's products and entirely omitted any reference to risks associated with third-party vendors (like Becton Dickinson).

### B. Defendants Admit Meridian's Internal Controls Were Inadequate Throughout the Class Period

205. In the 2017 Form 10-K, Defendants admitted that throughout the Class Period the Company had "deficiencies related to Information Technology General Controls ('ITGC') intended to restrict access to certain data and applications, resulting in inappropriate access at both the Information Technology and end user levels within an application impacting financial reporting functions and controls."

206. While Meridian's disclosure of its internal control violations lacks specific detail, it can be inferred from what Meridian ***did not say*** based on the timing and other Company admissions that these violations relate to Magellan's numerous internal control deficiencies alleged herein that admittedly existed during the Class Period, and still exist today. First, prior to the Magellan acquisition, Meridian did not report any internal control problems. In fact, Meridian even failed to avail itself to the SEC safe harbor allowing for the exclusion of an internal controls

evaluation of a newly acquired company for the first two quarters following the Merger's closing. *See* ¶¶ 147-48.

207. However, this forthrightness by the Company was short-lived, as in the 2016 Form 10-K (filed in late November 2016 – around the same time Meridian oversaw a Magellan that sent out its latest notice to customers requiring incubation time), the Company specifically disclaimed any evaluation of Magellan's internal controls:

> ***Noting that the Company's assessment of and conclusion on the effectiveness of its internal control over financial reporting did not include the internal controls of Magellan Biosciences, Inc., which was acquired during fiscal 2016 and the results of which since the date of acquisition were included in the 2016 consolidated financial statements***, there have been no changes in our internal control over financial reporting identified in connection with the evaluation of internal control that occurred during the fourth fiscal quarter that has materially affected, or is reasonably likely to affect, our internal control over financial reporting, or in other factors that could significantly affect internal control subsequent to September 30, 2016.

208. The Company further sought cover from the regulatory carve out in the February 2017 10-Q, which caveated that:

> The Company's assessment of and conclusion on the effectiveness of its internal control over financial reporting did not, and is not required to include the internal controls of Magellan Biosciences, Inc., which was acquired during fiscal 2016 and the results of which have been included in the Company's consolidated financial statements since the date of acquisition.

209. This newfound exclusion of the Magellan internal controls analysis coincided with a quarter in which the Company represented in the February 2017 10-Q that "***[t]he first quarter of fiscal 2017 was characterized by strong performance*** from our Life Science and ***Magellan business units***, with significant weakness in our core diagnostics business in the U.S. (part of our Americas region)."

210. In actuality, and as would come to light following the Class Period and after a correction to Magellan's internal controls, Magellan's reported revenue increase was actually

attributable to a "large non-repeating international order" during the period – a specific factor that the Company would point to on January 25, 2018 when it announced significantly reduced revenue period-over-period:

> Our Magellan lead testing business unit revenues declined by 20% in the quarter year-over-year. ***Magellan was impacted*** by reduced test volumes on LeadCare systems using venous blood and ***by a difficult comparable due to a large, non-repeating international order in the year-ago period***. We continued to drive placements of LeadCare® II in the quarter, which will facilitate ongoing growth of this business. We anticipate a rebound in the Magellan business in the second quarter and a return to growth for the quarter.

211. Rather than acknowledge the 2017 quarter-over-quarter revenue growth as anomalous, the Company purposely remained silent on the issue so as to misrepresent the go-forward financial prospects of its recent acquisition. This being despite the fact that the Company has a specific portion of its financial statements to disclose any revenue concentrations among certain customers. In fact, in the February 2017 10-Q, the Company even pointed investors to the accompanying notes for a disclosure of revenue concentration risks: "Revenue concentrations related to certain customers within our Diagnostics and Life Science segments are set forth in Note 8 of the accompanying Condensed Consolidated Financial Statements."

212. That note states:

> Amounts due from two Diagnostics distributor customers accounted for 12% and 16% of consolidated accounts receivable at December 31, 2016 and September 30, 2016, respectively. Revenues from these two distributor customers accounted for 23% and 39% of the Diagnostics segment third-party revenues during the three months ended December 31, 2016 and 2015, respectively, and represented 17% and 29% of consolidated revenues for the fiscal 2017 and 2016 first quarters, respectively.

213. Moreover, the Company only copped to Magellan's internal control problems *after* the FDA Warning letter was issued on October 23, 2017 revealing Defendants' response to the Form 483 violations and, thus, the true extent of the internal control problems. This coincides with

at least the following internal control deficiencies that the FDA identified existed at Magellan, there the FDA found the Company, *inter alia*:

- did not ensure the design validation for devices conformed to defined user needs and intended uses;
- used an inadequate risk analysis with respect to falsely low lead results across the LeadCare product line;
- did not maintain adequate procedures for receiving, reviewing and evaluating customer complaints which led to customer complaints going improperly addressed or not addressed at all;
- failed to implement proper investigation or the institution of a Medical Device Report per FDA requirements;
- failed to maintain procedures for corrective and preventative action with respect to inbound complaints, including several that were left indefinitely open or closed without verifying any corrective instruction remediated the issue;
- failed to inform the FDA of several of its notices to customers that included incubation instructions to correct lead level underestimation;
- failed to adequately establish procedures for design change, including their failure to report changes to labeling to include incubation periods;
- expanded original acceptance criteria to fit results observed in validation studies rather than establishing these criteria prior to the study;
- failed to report multiple MDRs upon learning of a marketed device malfunction that was likely to cause death or contribute to a death or serious injury if the

malfunction were to recur related to the LeadCare Ultra system's underestimation of lead levels; and

- failed to establish a control product that conformed to specific requirements.

### C. The FDA Issues a Warning Letter to Becton Dickinson for Its Role in the LeadCare Problems

214. On January 11, 2018, the FDA issued a press release and warning letter to Becton Dickinson, seeking to address that company's role in the lead care underestimation issues.

215. In the press release, the FDA specifically stated that it was unable to corroborate Magellan's claim that the problem lay with BD's vacutainer tubes:

> Prior to this warning, Magellan informed its customers that the inaccurate results may potentially be related to the composition of the rubber stopper of certain BD blood collection tubes — specifically, tubes with lavender- or tan-colored tops — and advised customers to no longer use these types of tubes with Magellan's blood lead tests. The FDA could not verify these findings at the time and launched its own investigation into the issue to determine the cause of the inaccurate results, which included an inspection of BD's Franklin Lakes, New Jersey facility.
>
> At this time, the FDA does not have evidence showing that other blood tests are adversely affected when BD blood collection tubes are used, and these tubes remain on the market.

216. Magellan scrambled to control the negative news, and issued its own press release on January 16, 2018 that sought to "clarify" the FDA's recall as affecting LeadCare tests when using venous blood samples only. Importantly, that press release invoked the capillary qualifier when describing LeadCare II:

> Magellan's LeadCare II is a point-of-care (CLIA waived) blood lead testing system which is primarily used with capillary blood samples. A highly effective way to screen children and pregnant/lactating women is to use a fingerstick at the point of care providing the health care provider and the patient with an immediate result. Capillary point-of-care testing is a critical tool for addressing the risks associated with undiagnosed lead exposure.

### D. On the Heels of the FDA Recall and Warning Letter, Meridian Reports a 20% Decline in Operating Income

217. On January 28, 2018, the Company released its financial results for the first quarter of 2018 for the three months ended December 31, 2017. In addition to announcing ***a 20% decrease in operating income*** for the entire Company, new Meridian CEO Jack Kenny revealed the effect of the FDA recall on Magellan's business prospects:

> Our Magellan lead testing business unit revenues declined by 20% in the quarter year-over-year. Magellan was impacted by reduced test volumes on LeadCare systems using venous blood and by a difficult comparable due to a large, non-repeating international order in the year-ago period. We continued to drive placements of LeadCare® II in the quarter, which will facilitate ongoing growth of this business. We anticipate a rebound in the Magellan business in the second quarter and a return to growth for the quarter. We are continuing to work with the FDA regarding the use of venous blood with Magellan's LeadCare Testing Systems. We remain committed to strengthening Magellan's quality system and ensuring that all aspects of the system are in full compliance. We take this issue very seriously and are continuing to progress with the highest sense of urgency.

218. The Company further expanded on the effects of the Magellan debacle in the quarterly report filed with the SEC on Form 10-Q on February 7, 2018. Therein, the Company finally stated what the market already knew:

> As a result of these matters, we expect to experience delays in reinstating venous blood sample testing on our LeadCare products, as well as in obtaining 510(k) clearance for new Magellan products. We also expect delays in obtaining export certifications for Magellan products during the remediation period.

219. Finally, the quarterly report revealed that not only did the LeadCare products recall cost the Company 20% of its sales, Meridian was also experiencing remedial costs of approximately $500,000 with an additional expected $250,000 in remedial costs relating primarily to professional fees for regulatory consultants and periodic Quality System audits.

220. On March 21, 2018, Meridian announced a realignment of its organizational structure, announcing that the Company will operate through two business units (Diagnostics and

Life Science), both supported by a global corporate team, and each maintaining a consolidated sales and marketing team supporting the entire product portfolio.

### E. THE FDA CREDITS BECTON DICKINSON'S STUDIES THAT SHOWED THERE WAS A SIGNIFICANT CHANCE OF FALSE RESULTS WITH LEADCARE TESTS

221. Despite Meridian's efforts to paint Becton Dickinson's vacutainer tubes as the culprit, the FDA's March 22, 2018 press release made clear that it believed that the studies conducted by Becton Dickinson were robust and showed that there was a significant chance of false results with Magellan's LeadCare tests when used with whole blood collected from the vein and stored in certain BD tubes. This was because, according to Becton Dickinson's findings, the Anodic Stripping Voltammetry (ASV) technology used in Magellan LeadCare testing systems is not compatible with thiuram, a material found in the rubber stoppers of the BD.

222. Becton Dickinson also updated its instructions for the impacted vacutainer tubes to include a precaution that the products are not be used for lead testing with any LeadCare product, the only product BD is aware of that employs ASV technology.

223. Further, the March 22, 2018 press release confirmed that the FDA and CDC continued to independently analyze the underestimation issue in the LeadCare products and encouraged those potentially affected individuals to be re-tested and for physicians to refrain from using the products with vein-drawn blood.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

224. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the

issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

225. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Meridian and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

226. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's Magellan-related risk. Such actions allowed Meridian to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Meridian as the Individual Defendants were among Meridian's most senior management and were acting within the scope of their employment.

### A. THE INDIVIDUAL DEFENDANTS' KNOWLEDGE AND/OR RECKLESS DISREGARD FOR THE NUMEROUS LEADCARE PRODUCT COMPLAINTS AND MAGELLAN'S FAILURE TO COMPLY WITH FDA REGULATIONS

#### 1. Defendants' Admitted Due Diligence of Magellan Would Have Revealed Magellan's LeadCare Product Issues and FDA Non-Compliance

227. As discussed above, Defendants admit to having conducted extensive due diligence relating to the Magellan acquisition, including reviewing reports, documents, ***claims***, and ***correspondence and filings with "any Healthcare Regulatory Authority***" (*e.g.*, the FDA) as far back as 2010. *See* Section IV.D, *supra*. Moreover, according to CW1, Susan Rolih, VP of Regulatory Affairs Quality Assurance, did, in fact, visit the Magellan facility in connection with due diligence prior to the acquisition and would have reviewed, among other things, customer complaints about the LeadCare products and related FDA correspondence. Defendants Kraeutler

and Lueke were part of the due diligence team, and, thus, would also have known of these issues at the time of the Merger.

228. Accordingly, Defendants admittedly knew, or recklessly disregarded known issues with Magellan's LeadCare products at the time of the Merger.

### 2. Monthly and Quarterly Meetings and Reports Informed Defendants of Magellan's Class Period LeadCare Product Issues

229. According to CWs 1 and 2, Individual Defendants Kraeutler and Lueke attended monthly and quarterly meetings attended mainly by director-level employees, and the above CWs, during which Company performance and prospects, product quality and issues (including customer complaints) and other important issues were discussed. Amy Winslow from Magellan attended the monthly "Flash Call" meetings by telephone. PowerPoint presentations containing the above types of information were prepared with input from business unit heads and handed out in advance of the meetings for discussion.

230. Accordingly, Defendants would have been aware of LeadCare complaints from these monthly meetings. Indeed, as discussed above, Defendants' own disclosures confirmed they reviewed Magellan's products, technology and performance on a monthly basis and, thus, would have been aware of the LeadCare issues.

### 3. Internal Magellan Documents Differed Drastically from Defendants' Public Statements

231. Throughout the Class Period, the Individual Defendants continued to hold Magellan's LeadCare products out to the investing public as a point-of-care treatment that was part of a suite of diagnostic products that provided rapid and accurate results to its users. In actuality and as alleged herein, there were several internal Magellan reports, including numerous customer complaints, corrective action reports, engineering change orders, and MDRs sent to the

FDA, that all indicated just the opposite – that the LeadCare products required an incubation period of between 4 and 24 hours in order to provide accurate results, meaning the LeadCare family could be either accurate and slow or rapid and inaccurate, but not a combination of both when used on a venous blood draw.

232. As set forth herein, Magellan undertook a litany of pre-Class Period actions related to the underestimation of lead levels by its LeadCare products including, but not limited to: the September 2013 study that showed a reproducible trend in increased lead signal with incubation time; the receipt of several separate complaints related to its different LeadCare systems; the submission of a Device Malfunction MDR to the FDA for certain of these complaints; the initiation of a correction action report to investigate the issue of lead level underestimation; multiple notices to customers instructing them to adopt an incubation period to prevent underestimation of lead concentration; the opening of several ECOs to change the labeling instructions for LeadCare Plus and Ultra to including incubation; and the sending of a formal complaint to Becton Dickinson regarding an observed negative bias in test results obtained from Magellan's products using blood collected in BD vacutainer tubes.

233. Further, the products' own labeling instructions had undergone corrections to require an incubation period and Magellan sent its customers notice of the same – each an admission of the reality that the products could not be used as designed for fast, accurate venous blood level readings.

234. These formal actions continued to occur during the Class Period, with Meridian overseeing Magellan, including that: (i) sent the November 2016 notice to customers of the Company's LeadCare II system instructing them to implement a four hour incubation period (a period which was not properly validated by Magellan); (ii) opened ECO 7060 to revise LeadCare

II's labeling to include incubation; (iii) received Customer Complaint Case # 00132411 on January 13, 2017 related to five separate events of underestimation of blood lead levels with five different patients while using the suggested incubation period, and later confirmed that claim; and (iv) closed CAR 108 on March 21, 2017 for that very issue despite any lack of verification that the four hour incubation period was effective.

235. Yet the Individual Defendants continued to propagate false information that diametrically opposed the known truth through the Company's SEC filings and in quotes attributed to Defendant Kraeutler.

236. These affirmative actions, which included the creation of formal reports sent to the FDA and internal reports related to corrective actions and engineering changes, as well as a formal complaint sent to a Magellan third-party vendor, all necessarily implicate that such information was available to Meridian's management team during its due diligence process to vet the acquisition of Magellan.

237. As such, the Individual Defendants either uncovered the various reports and details of the LeadCare issues during Meridian's due diligence phase or they recklessly disregarded these facts, all the while overseeing a wantonly deficient process that placed the health of millions at risk.

**4. Meridian's January 2017 Guidance Adjustment Evidences the Individual Defendants' Knowledge of LeadCare Issues**

238. On October 18, 2018, the Company issued a press release announcing its preliminary fiscal 2016 operating results and providing a revenue and earnings guidance for fiscal 2017.

239. Therein, the Company reported revenue of $196 million for fiscal 2016 and touted an optimistic guidance for 2017:

> Based on planning and budgeting activities for fiscal 2017, incorporating the recent Magellan acquisition and new Diagnostics sales and marketing leadership, net revenues for fiscal 2017 are expected to be $205 million to $210 million, representing growth of 5% to 7%. Per share diluted earnings for fiscal 2017 are expected to be between $0.81 and $0.85, representing 1% to 8% growth, excluding costs associated with acquisition activities and the reorganization of sales and marketing leadership in 2016.

240. Individual Defendant Kraeutler was quoted in that press release, touting the role Magellan played in the Company's success to that point and Meridian's expectations for the future:

> Magellan Diagnostics, acquired in March of 2016 and included in our Diagnostics Segment, has exceeded expectations thus far. For fiscal 2017, we are expecting low double-digit revenue growth on a normalized annual basis from continued success in placing the LeadCare II platform in the domestic market.

241. This same press release was attached as an exhibit to a Current Report Form 8-K filed by the Company with the SEC on October 20, 2016, which was signed by Individual Defendant Lueke as Executive Vice President and CFO of Meridian.

242. On November 10, 2016, Meridian issued a press release reporting the final financial results for the fourth quarter and full fiscal year ended September 30, 2015. With respect to the Company's 2017 guidance, in that press release, Individual Defendant Kraeutler is quoted as stating:

> Our guidance for fiscal 2017 is now published. ***We believe these projections are reasonable, and will prove to be realistic, with quarter-to-quarter results supporting our expectations***. Our core diagnostics unit will continue to focus on providing a total solution to diagnostic challenges, largely led by our simple and rapid illumigene® molecular platform. . . ***Finally, Magellan Diagnostics, acquired in March 2016, has exceeded our expectations in satisfying the demand for testing children for elevated blood lead levels***. The focus on this topic is expected to continue as the impact of elevated levels continues to be recognized as an important cause of developmental issues in young children. Recently, we have introduced the Magellan products to the global markets with a very positive response. ***This business unit is expected to report low-double-digit organic growth in fiscal 2017 with the potential for upside performance***.

243. The Company also reaffirmed its previously announced guidance of $205 million to $210 million and per share diluted earnings between $0.81 and $0.85.

244. This same press release was attached as an exhibit to a Current Report Form 8-K filed by the Company with the SEC on November 10, 2016, which was signed by Individual Defendant Lueke as Executive Vice President and CFO of Meridian.

245. However, on January 25, 2017, ***just two and a half months later***, Meridian issued a press release reporting its financial results for the first quarter of 2017, announcing that the Company was both reducing its regular cash dividend and revising its fiscal 2017 guidance downward. The announcement sent the Company's common stock tumbling, from a closing stock price of $16.45 on January 24, 2017, to $12.80 on January 25, 2017 – a loss of more than 22%.

246. Despite touting Magellan's quarterly performance and a reported quarter-over-quarter 32% revenue growth (performance that would later be exposed as the result of a large one-off international order and not any larger market share capture or breakthrough), the Company revised its Fiscal 2017 Guidance downward:

> Based on current business trends for the fiscal year ending September 30, 2017, management now expects net revenues to be in the range of $193 million to $199 million and per share diluted earnings to be between $0.64 and $0.69. Prior guidance was for revenues in the range of $205 million to $210 million and per share diluted earnings of $0.81 to $0.85. The per share estimates assume an increase in average diluted shares outstanding from approximately 42.4 million at fiscal 2016 year end to approximately 42.6 million at fiscal 2017 year end. The revenue and earnings guidance provided in this press release is derived from expected internal growth and does not include the impact of any acquisitions the Company might complete during fiscal 2017.

247. The real reason for the guidance adjustment, however, was that several Magellan actions taken after the November 2016 guidance pointed to the writing on the wall for the Individual Defendants with respect to the LeadCare products and the FDA and the decreased

guidance and cut dividend represented a materialization of the risks known only to Defendants at that point.

248. For example, on November 4, 2016, Meridian sent its Magellan customers a "Notice to Customers" instructing them to implement a four hour incubation period before testing venous blood samples in its LeadCare II system.

249. Magellan similarly issued a product bulletin on November 11, 2016, titled "Effect of Rubber Cap Interference on the LeadCare II System." Therein, the company identified the Becton Dickinson rubber stopper as causing the lead level underestimation and instructed a four hour incubation period.

250. This was followed by the November 17, 2016 opening of ECO #7060 to revise the LeadCare II labeling instructions to include the four hour incubation period – with Magellan itself acknowledging on the ECO that this incubation period change was one that "affects the design, production or assessment of product form, fit, or function."

251. Finally, according to the cover page of the MDR filed by Magellan with the FDA on May 8, 2017, Magellan had tried to submit an MDR related to the LeadCare underestimation issues in the LeadCare II product in November 2016. However, the company originally attempted to submit the report in paper form and it was subsequently returned by the FDA with the instruction to be submitted electronically. Despite registering with the FDA for an electronic submission account in February 2016, Magellan never followed suit and timely followed this MDR – waiting until May 8, 2017 to do so, on the eve of the FDA's site inspection.

252. When viewed holistically, the presence of these Magellan actions after the initial guidance, but prior to the Company's downward adjustment, present a cogent and compelling

explanation for Meridian's actions, particularly as the guidance was "derived from expected internal growth."

253. This contention is further corroborated by the fact that the Company exceeded its adjusted guidance for FY 2017, announcing net revenues of $200.8 million on November 9, 2017, just edging past the adjusted $193 to $199 million guidance range – a range that was not further adjusted upon the July 27, 2017 announcement of the Company's Magellan-related impairment charge and the presumably lower outlook based on the attendant reputational hit.

### 5. The Individual Defendants' Misleading Representations Occurred Shortly Before the Release of Starkly Inconsistent Information

254. As late as May 10, 2017, ***just seven days prior to the FDA recall announcement and the first day of the FDA's Magellan site visit***, Meridian claimed in its quarterly report filed on Form 10-Q that "Magellan is a leading manufacturer of FDA-cleared products for the testing of blood to diagnose lead poisoning in children and adults" and that "there ha[d] been no material changes from risk factors as previously disclosed" in the Company's 2016 Form 10-K, despite the fact that the Company was on the verge of a regulatory disaster with respect to the LeadCare recall.

255. Just one week later, on May 17, 2017, the FDA would announce a recall for LeadCare products because the lead level underestimation issues and issued a safety notice stating that the products were unsafe with respect to blood drawn from the vein.

### 6. The FDA's and CDC's Investigation, Findings and Injunction are Probative of Defendants' Scienter

256. Following its site inspection of the Magellan facility, the FDA released its findings in the Form 483, noting nine separate overarching observations, each consisting of multiple parts. The FDA then issued its warning letter on October 23, 2017, finding Magellan's response

insufficient to that point. Both the Form 483 and October 23, 2017 Warning Letter relate to Class Period actions and thus are probative of Defendants' Class Period scienter.

257. The FDA was joined by the CDC in its investigation and at least one press release on the LeadCare issue, further indicating the gravity of the situation.

258. On May 18, 2017, the FDA posted a Class I Device recall for the LeadCare Ultra and Plus blood lead tests based on the underestimation issue, recommending the removal of venous blood samples as an allowable sample type for all LeadCare products. That recall was expanded on June 5, 2017 to include the LeadCare and LeadCare II products. Class I device recalls are the most serious of FDA recalls and involve situations where there is a reasonable probability that use of the product will cause serious adverse health consequences or death.

**7. The Suspicious Timing and Circumstances of Kraeutler's Retirement Announcement Supports an Inference of Scienter**

259. On May 10, 2017 the Company announced that Defendant Kraeutler would retire, the same day the FDA began its site inspection of the Magellan facility and just one week prior to the FDA's recall and safety notice announcements, and less than seven months after signing the Third Amended Employment Agreement, which contemplated Defendant Kraeutler's continued employment with the Company through September 2018.

260. The unusual timing of Defendant Kraeutler's retirement announcement and the embarrassment surrounding the circumstances of the FDA's recall, particularly as it occurred so soon after the Company's acquisition of Magellan during which Meridian purported to have vetted Magellan and its products, strongly suggests that the departure was closely related to the alleged misconduct and provides additional indicia of Defendant Kraeutler's scienter.

### B. MERIDIAN'S CORPORATE SCIENTER BY VIRTUE OF THE KNOWLEDGE AND/OR RECKLESSNESS OF ITS EXECUTIVE VICE PRESIDENT, AMY WINSLOW

261. Prior to the Merger, Amy M. Winslow acted as President and Chief Executive Officer of the independent Magellan, joining the company in that role in 2011.

262. In this role, Winslow oversaw myriad corporate actions by Magellan related to the lead underestimation issues, including, *inter alia*, the initiation of a corrective action report, the sending of a complaint letter to Becton Dickinson, the amending of use instructions, the sending of notices to customers to require an incubation period, and the filing of the April 2015 MDR with the FDA.

263. In fact, FDA regulations required that Winslow be apprised of these occurrences pursuant to 21 C.F.R. § 820.100(a)(7), as all relevant information on identified quality problems, as well as corrective and preventive actions, must be submitted for "management review."

264. In connection with the Merger Agreement signed between the Company and Magellan, Meridian entered into an employment agreement with Winslow, dated March 21, 2016 (the "Executive Employment Agreement"). The Executive Employment Agreement was executed by Defendant Kraeutler, on behalf of, and as CEO of Meridian, and Winslow.

265. The recitals in the Executive Employment Agreement made clear that Winslow was being offered, and so accepted, a position as an executive vice president with Meridian (identified in the Executive Employment Agreement as the "Company") immediately upon the close of the Merger:

> WHEREAS, Company intends to acquire Magellan Biosciences, Inc., a Delaware corporation ("Magellan") through a merger transaction (the "Transaction");
>
> WHEREAS, Executive is the President and Chief Executive Officer of Magellan prior to the closing of the Transaction;

> WHEREAS, the Company is engaged in the business of selling diagnostic test kits, purified reagents and biopharmaceutical enabling technologies, which, along with any other products, services or activities offered or performed by the Company during the term of Executive's employment with the Company, is herein defined as its "Business";
>
> WHEREAS, the Company desires to employ the Executive, and the Executive desires to become an Executive and to provide services as the Executive Vice President of the Company and President and Chief Executive Officer of Magellan on behalf of Company on the terms set forth in this Agreement, contingent upon the closing of the Transaction

266. Further, the defined "Term" of the Executive Employment Agreement makes clear that Winslow's employment with Meridian began upon the closing of the Merger:

> 1.1 Term. Contingent upon and effective as of the closing of the Transaction, and subject to the termination provisions set forth in Article III, the Company will employ the Executive and the Executive accepts employment with the Company for an initial term of three (3) years (the "Term"). Thereafter, the term of this Agreement automatically shall be extended for additional periods of one (1) year, unless either party provides the other party with written notice of its intent not to renew this Agreement at least one hundred twenty (120) calendar days before the termination date.

267. The Merger was completed on March 24, 2016, as announced by Meridian and Magellan, thus, Winslow commenced her position as Executive Vice President of Meridian, President and CEO of Magellan on that date.

268. A review of the Definitive Proxy Statement filed by Meridian with the SEC on December 14, 2016 identifies Winslow as holding that same position as of November 30, 2016, listing Winslow in a table setting forth the Company's Directors and Executive Officers, alongside Defendants Kraeutler and Lueke, among others. Further, as of the filing of this complaint, a review of the Meridian website shows Winslow listed as the Executive Vice President, President and CEO Magellan Diagnostics for Meridian.

269. The definitive proxy statement filed by the Company with the SEC on December 14, 2017 on Schedule 14A (the "2017 Proxy Statement") similarly lists Winslow as occupying that same position as of November 30, 2017:

**DIRECTORS AND EXECUTIVE OFFICERS**

This table lists the Executive Officers and Directors of Meridian and shows the number of shares beneficially owned, as determined under SEC rules, on November 30, 2017. Beneficial ownership includes any shares as to which the individual has sole or shared voting or investment power and also any shares that the individual has the right to acquire within 60 days.

| Name | Position | Common Stock Beneficially Owned | |
|---|---|---|---|
| | | Amount[1] | Percentage |
| John A. Kraeutler | Executive Chairman of the Board and Director | 444,561 | 1.0% |
| Jack Kenny | Chief Executive Officer and Director | — | — |
| Richard L. Eberly[2] | Executive Vice President, President, Chief Commercial Officer | 23,348 | * |
| Lawrence J. Baldini[3] | Executive Vice President, President, Global Operations | 69,254 | * |
| Melissa A. Lueke[4] | Executive Vice President, Chief Financial Officer and Secretary | 130,523 | * |
| Vecheslav A. Elagin[5] | Executive Vice President, Research & Development, and Chief Scientific Officer | 26,819 | * |
| Susan D. Rolih[6] | Executive Vice President, Global Regulatory & Quality Systems | 131,039 | * |
| Amy M. Winslow[7] | Executive Vice President, President and Chief Executive Officer, Magellan | 3,400 | * |
| Marco G. Calzavara[8] | President and Managing Director, Meridian Bioscience Europe | 17,057 | * |
| James M. Anderson[9, 10, 11] | Director | 87,000 | * |
| Dwight E. Ellingwood[11] | Director | 41,500 | * |
| John C. McIlwraith[10, 11] | Director | 32,000 | * |
| David C. Phillips[9, 10] | Director | 121,626 | * |
| John M. Rice[12] | Director | 12,000 | * |
| Catherine A. Sazdanoff[9] | Director | 36,700 | * |
| All Executive Officers and Directors as a Group | | 1,176,827 | 2.7% |

270. Further, the footnote accompanying the table indicates that Winslow has held the position continuously since being appointed in March 2016:

> Amy M. Winslow was appointed Executive Vice President & President and Chief Executive Officer of Magellan in March 2016 at the time Meridian acquired Magellan, having served as President and Chief Executive Officer of Magellan since October 2011. With over 20 years of experience in health care, prior to joining Magellan, Ms. Winslow served as President of MW Advisory (June 2004 – October 2011) and Vice President, Marketing for Athena Diagnostics (August 1999 – June 2004). Age: 46

271. During the Class Period and as Meridian Executive Vice President, President and CEO of Magellan, Winslow oversaw several corporate actions related to the lead level underestimation issues, including (i) sending the November 2016 notice to customers of the Company's LeadCare II system instructing them to implement a four hour incubation period (a

period which was not properly validated by Magellan); (ii) the opening of ECO 7060 to revise LeadCare II's labeling to include incubation on November 17, 2016; (iii) Magellan's intake of Customer Complaint Case # 00132411 on January 13, 2017 related to five separate events of underestimation of blood lead levels with five different patients; and (iv) the March 21, 2017 closing of CAR 108 for that very issue despite any lack of verification that the four hour incubation period was effective.

272. Pursuant to 21 C.F.R. § 820.100(a)(7), Winslow had to be made aware of each of these corrective actions.

273. Additionally, as confirmed by CW2, Winslow participated in monthly "flash calls" with Meridian management by telephone.

274. Further evidencing Winslow's control over the operations of Magellan prior to and during the Class Period is the fact that the FDA's Form 483 was directed to Winslow, Winslow authored and signed the response letter to the FDA dated July 21, 2017, and the FDA's October 23, 2017 warning letter was directed to her.

275. Additionally, Defendant Kraeutler's own statements support a finding of actual knowledge of the LeadCare issues dates as far back as 2014 (at which point Winslow was Magellan's president and CEO – knowledge she necessarily carried with her to her new position as Executive Vice President of Meridian in charge of Magellan).

276. Several additional factors also evidence Winslow's knowing and/or reckless actions during the Class Period, contributing to a mental state that evidences an intent to deceive, manipulate, or defraud, or a reckless disregard of such.

277. *First*, Winslow was aware of or recklessly disregarded the divergence between internal reports, including corrective action reports, engineering change orders, and MDRs sent to

the FDA, that all indicated that the LeadCare products required an incubation period of between 4 and 24 hours in order to provide accurate results in the face of Meridian statements to the contrary that touted the LeadCare products' rapid diagnosis capabilities and accuracy.

278. Further, the products' own labeling instructions had undergone corrections to require an incubation period and Magellan, under the stewardship of Winslow, sent its customers notice of the same – each an admission of the reality that the products could not be used as designed for fast, accurate venous blood lead level readings.

279. *Second*, certain of the false statements alleged in this complaint occurred as late as May 10, 2017, **just seven days prior to the FDA recall announcement and the first day of the FDA's Magellan site visit**, yet Winslow knowingly or recklessly ratified, disregarded, or tolerated the false statements made by Meridian.

280. *Third*, Winslow knowingly or recklessly ratified, disregarded, or tolerated the false statements made by Meridian that blatantly disregarded the most current factual information existing at the time those statements were made, including, but not limited to the ongoing issues with the LeadCare products and Magellan's steps to institute an incubation period, thus rendering the product no longer point-of-care when used on blood drawn from the vein. This knowing or reckless ratification, disregard or tolerance took many forms throughout the Class Period including, *inter alia*, the signing off on Magellan-related statements in all Class Period SEC filings, as was Meridian's policy per CW1.

281. *Fourth*, during the Class Period, Winslow maintained a certain self-interest in the form of saving her compensation and job which further evidences her state of mind and led her to knowingly or recklessly ratify, disregard, and/or tolerate the misstatements alleged herein.

282. As set forth in the Executive Employment Agreement, as the head of the Magellan business group, Winslow's bonus compensation was directly tied to Magellan's performance, not Meridian's as a whole:

> 2.2 Bonus Opportunity. During the Term, in addition to the base salary specified in Section 2.1, Executive shall be eligible to participate in the Corporate Incentive Plan, Level 6 in a manner consistent with other executive employees of Executive's level at Company. The Corporate Incentive Plan provides a bonus opportunity of up to one hundred twenty percent (120%) the amount of Executive's base salary upon the achievement of certain earnings targets and individual performance goals established by the Company each year with respect to the Company's business and Executive's performance. ***For calendar years 2016 and 2017, the performance targets will be based on the performance of Magellan as outlined below:***
>
> ***(a) For calendar year 2016, minimum achievement of Three Million Four Hundred Seventy-Five Thousand Dollars ($3,475,000.00) of operating income as adjusted for known savings as a result of the Transaction and additional incentive compensation costs, including bonus.***
>
> ***(b) For calendar year 2017, minimum achievement of Five Million Three Hundred Seventy-Five Thousand Dollars ($5,375,000.00) of operating income as adjusted for known savings as a result of the Transaction and additional incentive compensation costs, including bonus.***
>
> The operating income target specified in Sections 2.2(a) and (b) above must be achieved after recording all applicable incentive compensation expense. Performance targets for fiscal year 2018 and all subsequent fiscal years during the Term shall be approved by the Board of Directors of the Company.

283. The focus on Magellan's operating income as a catalyst for her bonus necessarily provided Winslow a motive to secure for herself a bonus of approximately $396,000 for both 2016 and 2017 (base salary of $330,000 times 120% bonus payout indicated in the Executive Employment Agreement). All that was required was for her to ratify, recklessly disregard, or tolerate the false statements of the Company that obfuscated the truth about Magellan's LeadCare products — an easy task, particularly since so many of these false statements were embedded in

documents that otherwise touted Magellan's performance and capabilities and otherwise contributed to that business line's success.

284. Further, any goodwill impairment would have directly decreased the operating income of Magellan, rendering Winslow's achievement of her bonus goals a virtual impossibility, given that the eventual impairment taken by the Company related to the Magellan business was approximately $6.6 million – ***more than the targeted operating income required to receive the bonus payout***. Thus, Winslow was particularly motivated to ratify, recklessly disregard, or tolerate the false statements identified herein related to Meridian's goodwill and impairment analyses so as to not lose any shot at her bonus compensation.

285. With respect to equity, Ms. Winslow's tiered new-hire equity grant was set on a pro rata three-year vesting schedule, meaning any failure in her leadership over Magellan prior to her one-year anniversary could have resulted in her termination from Meridian with no equity to show for her time there, with further time restrictions requiring her to remain employed by Meridian for the full three year period before seeing any equity:

> 2.3 Equity. Upon the closing date of the Transaction and commencement of employment, Executive shall (i) receive a grant of 10,000 stock options under the 2012 Stock Incentive Plan ("Stock Incentive Plan"), which shall be subject to a three (3) year pro rata vesting schedule, and shall (ii) receive a pro rata share (based on the closing date of the Transaction) of a grant of 10,000 time-based restricted stock units under the Stock Incentive Plan which shall be subject to a three (3) year cliff vesting schedule, requiring Executive to be employed with Company at the end of such three (3) year period; and (iii) receive a pro rata share (based on the closing date of the Transaction) of a grant of 10,000 performance-based restricted stock units under the Stock Incentive Plan, which shall be subject to a three (3) year pro rata vesting schedule, provided the Company attains the net earnings targets for the applicable period as approved by the Board of Directors of the Company. The restricted stock units shall include a dividend equivalent feature. Executive shall be eligible to participate in the Company's Stock Incentive Plan in a manner consistent with other employees of the Executive's level in subsequent fiscal years.

286. Winslow's state of mind during the Class Period is properly imputed to the Company by virtue of her high managerial position with Meridian as an executive vice president and her ratification, reckless disregard, and/or tolerance of the misrepresentations regarding Magellan's LeadCare products, as identified, *supra*.

### C. Defendants Were Motivated to Commit the Alleged Fraud

#### 1. The Magellan Acquisition Was Critical to Salvage Meridian's Declining Non-Molecular Diagnostics Business and the Company's Future Long-Term Viability

287. At the time of the Merger, Meridian was at a crossroads. After losing market share to competitors in the non-molecular diagnostic space, the Company was one of the first to break into the molecular space with illumigene. Their relative control over the space was short-lived, however, as new entrants began to undercut their offerings and siphon off customers. With no hope of winning back those lost customers given the limitations of illumigene, and the forthcoming loss of market share to accompany the expiration of the Company's prized *H. Pylori* patent, Defendants turned to their plan B – a quick acquisition of Magellan to artificially buoy financial results.

288. Of course, the Merger came at the human cost of more than 8 million individuals who were subjected to a knowingly-flawed test and whose well-being was placed in jeopardy as Defendants continued to blur their products' shortcomings in an effort to prop up the struggling Company.

289. In the end, Defendants were motivated to uphold the charade related to their LeadCare products in the face of declining sales in the Company's key legacy non-molecular products. As identified by Kurt Kemper of Hilliard in his July 29, 2016 note (just four months after the Merger), the shifting landscape created an untenable situation for Meridian:

> Our initial thesis on Meridian was that the company, due to a high dividend payout ratio, is subject to long cash building and deploying cycles. . . Organically, we expected modest growth stemming from strength in smaller business lines, such as Meridian Life Science and illumigene, to offset modest (low single digit) declines in the older, larger immunoassay products. . . However, we now believe we were wrong about part three of our thesis: older products are losing ground more rapidly than we expected and, based on guidance and key immunoassay categories (i.e. foodborne), are likely to continue to do so.

**2. Defendants' Motive to Collect Their Significant Stock Option Grant from the Magellan Acquisition**

290. Rather than publicly acknowledge the issues with their latest acquisition and withstand the financial hit associated therewith, the Individual Defendants decided to do nothing – either hoping that the issues would go undetected or kicking the can down the road to be dealt with at a time when the Company's other lines of business could better absorb any blowback.

291. All the while, Defendants Kraeutler and Lueke continued to collect their salaries and employment incentive awards, totaling more than $1.06 million and $1.9 million in total compensation for Individual Defendant Kraeutler in 2014 and 2015, respectively, and $559,000 and $493,000 over the same period for Individual Defendant Lueke.

292. Additionally, as identified in the Company's Definitive Proxy Statement filed on Schedule 14A with the SEC on December 14, 2016, each of the Individual Defendants was given a special grant of stock options related to the Magellan acquisition, with Individual Defendant Kraeutler receiving 15,000 options, valued at approximately $53,300, and Individual Defendant Lueke receiving 12,500 options, valued at $44,416.

## IX. LOSS CAUSATION

293. At all relevant times, the market for Meridian securities was open, well-developed, and efficient. During the Class Period, Defendants named in this Action materially misled the investing public by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their statements, as set forth herein, not false and/or misleading,

thereby inflating the price of Meridian securities. These material misstatements and omissions concerned the capabilities, performance, and profitability of the Company's diagnostics segment, particularly the Magellan business line. Defendants' materially false or misleading statements and omissions of material fact, alleged above in Section V, caused the price of Meridian's securities to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Lead Plaintiff and other Class Period purchasers of Meridian securities.

294. Plaintiff and other members of the Class purchased or otherwise acquired Meridian securities relying upon the integrity of the market of Meridian and market information related to the Company, and have been damaged thereby. For example, on March 24, 2016, after the close of the market, Meridian announced its acquisition of Magellan, touting the operation as one that provides "(i) ***an important point-of-care capability***, (ii) ready-made access and expansion of certain of Meridian's products into the pediatric market, (iii) expansion of Magellan's products into international markets where Meridian has a presence, (iv) opportunities within Meridian's hospital market as hospitals acquire physician office practices, and (v) ***a new growth driver as the importance of lead testing and remediation in the United States and global community becomes better understood***." On the news, Meridian's common stock increased from a closing price of $19.56 on March 24, 2016 to $20.41 on March 28, 2016 (the first trading day following the announcement), and $21.21 on March 29, 2016, representing a one day increase of 4.35% and a two-day increase of 8.4%.

295. As Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Meridian's securities was removed, and the price of Meridian shares fell. For example:

296. On January 25, 2017, Meridian issued a press release reporting its financial results for the first quarter of 2017, announcing that the Company was both reducing its regular cash dividend and revising its fiscal 2017 guidance downward (which is based on go-forward projections). The truth, however, was that the Defendants recognized that the Magellan line of business was untenable given the major flaw in LeadCare's technology and that future forecasts for that business, and the Diagnostic business as a whole, could no longer support the guidance. This announcement sent the Company's common stock tumbling, from a closing stock price of $16.45 on January 24, 2017, to $12.80 on January 25, 2017 – a loss of more than 22%.

297. On May 17, 2017, the FDA issued a public safety announcement, warning against the use of LeadCare products because of their issues with underestimating lead levels in vein-drawn blood. As a direct result of the disclosures on May 17, 2017, Meridian's stock price suffered a significant decline. On May 17, 2017, the Company's common stock price closed at $13.45 per share (down from $14.75 the previous trading day) on volume of more than 808,000 shares – more than three times the 242,000 shares transacted on the prior day. The financial news media specifically linked these declines with the FDA announcement.

298. However, Meridian's stock price remained artificially inflated as Defendants continued to conceal the adverse impact of the FDA's announcement, including, *inter alia*, the forthcoming impairment charge to goodwill and the FDA's multiple observations of Magellan's regulatory shortfalls during its then-ongoing site inspection.

299. On October 23, 2017, the FDA issued a formal warning letter disclosing to the market for the first time the true extent the Company's non-compliance with FDA regulations and that Magellan's actions and oversight were insufficient due to an obvious lack of internal controls.

300. Upon the news reaching the market, Meridian's stock price dropped from a closing price of $15.80 per share on October 20, 2017 to $15.20 per share on October 23, 2017, then to $14.50 per share on October 24, 2017 – a one day drop of approximately 4% and a two-day drop of more than 8%.

301. As a result of their purchases of Meridian stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price decline in Meridian stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## X. PRESUMPTION OF RELIANCE

302. At all relevant times, the market for Meridian common stock was efficient for the following reasons:

(a) Meridian common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b) As a regular issuer, Meridian filed periodic reports with the SEC and Nasdaq;

(c) Meridian regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Meridian was followed by numerous securities analysts employed by major brokerage firms, many of which are quoted herein, who wrote reports which were distributed to

those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

303. As a result of the foregoing, the market for Meridian securities promptly digested current material information regarding Meridian from all publicly available sources and reflected such information in Meridian's stock price. Under these circumstances, all purchasers of Meridian securities during the Class Period suffered similar injury through their purchase of Meridian securities at artificially inflated prices, and a presumption of reliance applies.

304. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

305. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

306. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

307. To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements that (i) Magellan provided FDA-cleared products; (ii) Meridian was in compliance with all regulatory requirements; (iii) the LeadCare family of products were all highly accurate and

capable of providing rapid, point-of-care results; and (iv) the Company failed to maintain adequate internal controls. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Meridian were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

308. To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

## XII. CLASS ACTION ALLEGATIONS

309. Lead Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Meridian securities during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

310. Excluded from the Class are Meridian and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

311. Because Meridian had millions of shares of common stock outstanding during the Class Period, and because its securities were actively traded on the Nasdaq, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Lead Plaintiff believes that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by Meridian or its transfer agent and may be notified

of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

312. Lead Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

313. Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.

314. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

(e) Whether Defendants violated the federal securities laws as alleged herein;

(f) Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Meridian's business and operations;

(g) Whether the price of Meridian's securities was artificially inflated during the Class Period; and

(h) The extent to which members of the Class have sustained damages and the proper measure of damages.

315. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Meridian and the Individual Defendants

316. Lead Plaintiff realleges each allegation as if fully set forth herein.

317. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Meridian and the Individual Defendants (the "Count I Defendants").

318. The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

319. The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

320. The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

321. As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

322. Meridian is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Meridian in taking the actions alleged herein.

323. Lead Plaintiff and the Class purchased Meridian securities, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Lead Plaintiff and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Lead Plaintiff and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

324. At the time of the Count I Defendants' false statements, misrepresentations and omissions, Lead Plaintiff and the Class were unaware of their falsity and believed them to be true. Lead Plaintiff and the Class would not otherwise have purchased Meridian securities had they known the truth about the matters discussed above.

325. By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

326. As a direct and proximate result of the Count I Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their purchase of Meridian securities.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Meridian and the Individual Defendants

327. Lead Plaintiff realleges each allegation as if fully set forth herein.

328. This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Meridian and the Individual Defendants (the "Count II Defendants").

329. Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Meridian, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act. The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiff and the Class' investments in Meridian securities within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

330. The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

331. The Count II Defendants knew or recklessly disregarded the fact that Meridian's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

332. By virtue of their high-level positions and their participation in and awareness of Meridian's operations and public statements, the Count II Defendants were able to and did influence and control Meridian's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiff and the Class contend contained materially false and misleading information and on which Lead Plaintiff and the Class relied.

333. The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

334. As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

335. As a direct and proximate result of the Count II Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase of Meridian securities.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as a representative of the Class;

B. Awarding Lead Plaintiff and the members of the Class damages, including interest;

C. Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such other relief as the Court may deem just and proper.

## XIV. JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Lead Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated: April 16, 2018

/s/ *Shannon L. Hopkins*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Sebastian Tornatore (to be admitted *pro hac vice*)
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiff and the Class*

James R. Cummins (0000861)
**CUMMINS LAW LLC**
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202
Tel.: (513) 721-9000
Fax: (513) 721-9001
Email: jcummins@cumminslaw.us

*Liaison Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys on record.

*/s/Shannon L. Hopkins*
Shannon L. Hopkins (admitted *pro hac vice*)